## Case No. 11,558.

### Ex parte RANDOLPH.

[2 Brock. 447.] [1]

Circuit Court, D. Virginia.  Nov. Term, 1833.

OFFICER—ACTING PURSER IN NAVY—SETTLEMENT OF ACCOUNTS — POWER TO ORDER RE-SETTLEMENT—HABEAS CORPUS—CONSTITUTIONAL LAW.

1. A party was arrested and held in custody, by virtue of a distress warrant, issued from the treasury department, under an act of congress passed the 15th of May, 1820 [3 Stat. 592], "to provide for the better organization of the treasury department." The act provides in substance, for the issuing of this warrant by the agent of the treasury, against all military and naval officers, &c., charged with the disbursement of the public moneys, who shall fail to pay and settle their accounts at the treasury department. The party now in custody, was a lieutenant in the navy of the United States, and had officiated as acting purser of a national ship, supplying a vacancy occasioned by the death of the regularly commissioned purser of the ship, on the Mediterranean station, and had executed no official bond as purser. On his return to the United States, he had settled his account at the proper department, viz., in 1828; and in 1833, the then fourth auditor, opened and re-stated his account, on the ground that it had been erroneously settled in the first instance, and the account, as re-stated, exhibited a large balance against the party, due to the United States. Upon this re-stated account, the distress warrant was issued, by virtue whereof, the party was arrested and was brought up under a writ of habeas corpus, directed to the officer, who executed the warrant and held the petitioner in custody. *Held,* that the account of the petitioner as acting purser, having been once stated, and settled at the treasury department, the law invests the auditor with no power to open and re-settle it, of his own mere authority. The act creates a special and limited jurisdiction, and after the accounts of any of the class of officers on whom it was intended to act, have been adjusted, however erroneously, that special jurisdiction is functus officio, and any process issued upon a re-settlement of such accounts, is absolutely null and void. Per Barbour, J.

[Cited in brief in State v. Auditor, 61 Mo. 264.]

2. The act of congress authorizing the writ of habeas corpus to be issued, "for the purpose of inquiring into the cause of commitment," applies as well to cases of commitment under civil as to those under criminal process. Per Barbour, J.

[Cited in Re Reynolds, Case No. 11,722; Re Barry, 42 Fed. 124, 125, 136 U. S. 613, note; King v. McLean Asylum of Massachusetts General Hospital, 12 C. C. A. 145, 64 Fed. 343, 345.]

[Cited in Bell v. State, 4 Gill, 305.]

3. The decision of a question involving the constitutionality of an act of congress, is one of the gravest and most delicate of the judicial functions, and while the court will meet the question with firmness, where its decision is indispensable, it is the part of wisdom, and a just respect for the legislature, renders it proper, to waive it, if the case in which it arises, can be decided on other points. Per Curiam.

[Cited in Moore v. Supervisors of Wetzel Co., 18 W. Va. 639; Weimer v. Bunbury, 30 Mich. 218; Elliott v. Oliver, 22 Or. 44, 29 Pac. 2.]

4. Assuming that the act, under which this arrest was made, does not violate the constitution of the United States, which declares, that

"the judicial power of the United States, shall be vested in one supreme court, and in such inferior courts as congress shall from time to time, ordain and establish. The judges, both of the supreme and inferior courts, shall hold their offices during good behaviour." and extends the judicial power to "controversies to which the United States shall be a party;" yet, the authority vested by this law in certain agents of the treasury, and all acts done in pursuance thereof, are purely ministerial. The statement or certificate, authorized by the act, is not a judgment, and the warrant which coerces payment, is not judicial process. They are ministerial acts, (for, otherwise, they could not be sustained,) and the general principles of construction require, that the authority vested by the act, shall be strictly and literally pursued. Per Marshall, C. J.

[Cited in U. S. v. New Bedford Bridge, Case No. 15,867; Re Barry, 42 Fed. 120, 121, 136 U. S. 608, note.]

[Cited in Batchelder v. Whitcher, 9 N. H. 243; Ex parte Griffiths, 118 Ind. 86, 20 N. E. 513.]

5. The act does not apply, in sound construction, to every commissioned officer of the army or navy of the United States, to whose hands any public money may be entrusted, but only to those regularly appointed disbursing officers, who have given official bonds, with sureties for the faithful discharge of the duties of their office; it does not embrace a mere acting purser in the navy. Per Marshall, C. J.

6. The construction put by the court upon this act, does not affect the responsibility of a temporary acting disbursing officer of the army or navy, but simply denies his liability to the particular process authorized by the act. The responsibility of such an officer, is precisely the same, with that of the regularly appointed officer, who has given his official bond with surety, and if his account has been erroneously settled, it may be opened, and any balance remaining due from him to the United States. may be recovered in a regular course of legal proceeding. Per Curiam.

[Cited in Blake's Case, 106 Mass. 504.]

7. In case of an erroneous settlement, a bill in equity would lie to surcharge and falsify, as in the case of a settled account between individuals; and quære, if even at law, though the settled account would be prima facie evidence, the true balance might not be recovered upon proving mistakes and omissions? Per Barbour, J.

The petitioner, Robert B. Randolph, was brought into court by virtue of a writ of habeas corpus, directed to the marshal of the Eastern district of Virginia, requiring him to have the body of the petitioner, late acting purser of the United States frigate Constitution, and who was detained under the custody of the marshal, together with the cause of his being taken and detained, before the judges of this court. The writ was issued on the 3d of December, 1833, and was made returnable on the following day. The marshal, in his return, stated that, before the service of the writ of habeas corpus, there was a certain warrant sent to him by the solicitor of the treasury of the United States, against the goods and chattels, lands, tenements, and hereditaments, and the body, of Robert B. Randolph, late acting purser of the United States frigate Constitution, for a certain debt due by the said Randolph to the United Staes, by an account stated, which account stated, was sent

by the solicitor along with the warrant; that not finding goods and chattels of the said Robert B. Randolph to satisfy the debt, he arrested and took his body into custody, in obedience to the mandate of the warrant, on the 13th day of November, 1833: that these were the causes of the arrest and detention of the said Robert B. Randolph, whose body he had ready, as by the writ of habeas corpus, he was commanded. The warrant and the stated account referred to by the returning officer, were annexed to the return. The warrant was in the following words:—"Edmund Christian, Esq., United States Marshal for the Eastern District of Virginia:—Whereas, Robert B. Randolph, late acting purser of the United States frigate Constitution, stands indebted to the United States, in the sum of $25,097.83, agreeably to the settlement of his account, made by the proper accounting officers of the treasury, a copy of which is herewith enclosed: And, whereas, the said Robert B. Randolph, having failed to pay over, according to the act of congress passed the 15th day of May, 1820, entitled, 'An act to provide for the better organization of the treasury department,' the said sum of $25,-097.83: These are, therefore, in pursuance of the said act, to command you to proceed immediately, to levy and collect the said sum of $25,097.83, by distress and sale of the goods and chattels of the said Robert B. Randolph, giving ten day's previous notice of such intended sale, by affixing an advertisement of the articles to be sold, at two or more public places in the town or county, where the said goods and chattels may be taken, or in the town or county where the owner of such goods and chattels may reside; and should there not be found sufficient goods and chattels to satisfy the said sum of $25,097.83, remaining due and unpaid as aforesaid, you are hereby commanded to commit the body of the said Robert B. Randolph to prison, there to remain until discharged by due course of law. And should the said Robert B. Randolph be committed to prison, as aforesaid, or if he abscond, and goods and chattels sufficient to satisfy the said sum of $25,097.83 be not found, you are hereby further commanded to levy upon, and expose to sale at public auction, for ready money, to the highest bidder, the lands, tenements, and hereditaments of the said Robert B. Randolph, or so much thereof as may be necessary to satisfy the said sum of $25,097.83, or whatever sum there may remain due and unpaid after you shall have given notice of said sale, for at least three weeks prior to its taking place, in not less than three public places in the county or district where such real estate is situate. And all moneys which may remain of the proceeds of such sales, after satisfying the said sum of $25,097.83, and paying the reasonable costs and charges of the sale, you are required to return to the proprietor or proprietors of the land, or real estate sold as aforesaid. And, whatever you may do in obedience to this warant, make return thereof to this office, and for your so doing, this shall be your sufficient authority. (Signed) V. Maxcy, Solicitor of the Treasury." [2]

[2] It is essential to the proper understanding of this anomalous proceeding against Robert B. Randolph, that the 2d and 3d sections of the act on which it is founded, should be inserted, entire. They are as follows:

"Sec. 2. That from and after the 30th day of September next, if any collector of the revenue, receiver of public money, or other officer, who shall have received the public money before it is paid into the treasury of the United States, shall fail to render his account, or pay over the same, in the manner, or within the time, required by law, it shall be the duty of the first comptroller of the treasury, to cause to be stated, the account of such collector, receiver of public money, or other officer, exhibiting truly, the amount due to the United States, and certify the same to the agent of the treasury, who is hereby authorized and required to issue a warrant of distress against such delinquent officer and his sureties, directed to the marshal of the district in which such delinquent officer and his surety or sureties shall reside; and where the said officer, and his surety or sureties shall reside in different districts, or where they or either of them, shall reside in a district other than that in which the estate of either may be situate, which may be intended to be taken and sold, then such warrant shall be directed to the marshals of such districts, and to their deputies, respectively; therein specifying the amount with which such delinquent is chargeable, and the sums, if any, which have been paid. And the marshal, authorized to execute such warrant, shall, by himself or by his deputy, proceed to levy and collect the sum remaining due, by distress and sale of the goods and chattels of such delinquent officer, having given ten days' previous notice of such intended sale, by affixing an advertisement of the articles to be sold at two or more public places in the town or county where the said goods or chattels are taken, or in the town or county where the owner of such goods or chattels may reside; and if the goods and chattels be not sufficient to satisfy the said warrant, the same may be levied upon the person of such officer, who may be committed to prison, there to remain, until discharged by due course of law. Notwithstanding the commitment of such officer, or if he abscond, or if goods and chattels cannot be found sufficient to satisfy the said warrant, the marshal or his deputy may, and shall proceed to levy and collect the sum which remains due by such delinquent officer, by the distress and sale of the goods and chattels of the surety or sureties of such officer, having given ten days' previous notice of such intended sale, by affixing an advertisement of the articles to be sold, at two or more public places in the town or county where the said goods or chattels were taken, or in the town or county where the owner of such goods or chattels resides. And the amount due by any such officer, as aforesaid, shall be, and the same is hereby declared to be, a lien upon the lands, tenements, and hereditaments, of such officer and his sureties, from the date of a levy in pursuance of the warrant of distress issued against him or them, and a record thereof made in the office of the clerk of the district court of the proper district, until the same shall be discharged according to law. And for want of goods and chattels of such officer, or his surety or sureties, sufficient to satisfy any warrant of distress issued pursuant to the provisions of this act, the lands, tenements, and hereditaments, of such officer, and his surety or sureties, or so much thereof as may be necessary for that purpose, after being advertised, for at least three weeks, in not less than three public places, in the county or district where such

The stated account which was the basis of the warrant, was also annexed to the marshal's return. It purports to be a re-settlement of Robert B. Randolph's account, as acting purser of the frigate. Constitution; the former account, as was alleged, having been settled erroneously, and the errors and omissions in the former account being corrected in the re-stated account. The resettled account, composed for the most part of items, which had, on the former settlement been allowed as credits, exhibited a balance against Robert B. Randolph, of $25,229.17 "being for money received by him, at Port Mahon, on or about the 3d of April, 1828, for which he has not accounted, for slop clothing, and German linen, for which he claimed, and has obtained, an erroneous credit in the settlement of his account, and per advances to the officers and men of the frigate Constitution, for his pay roll; as it appears that portions of said advances were made out of the money

real estate is situate, prior to the time of sale, may, and shall be sold by the marshal of such district or his deputy; and for all lands, tenements, or hereditaments, sold in pursuance of the authority aforesaid, the conveyance of the marshals or their deputies, executed in due form of law, shall give a valid title against all persons, claiming under such delinquent officer, or his surety or sureties. And all moneys which may remain of the proceeds of such sales, after satisfying the said warrant of distress, and paying the reasonable costs and charges of the sale, shall be returned to such delinquent officer, or surety, as the case may be: provided, that the summary process herein directed shall not affect any surety of any officer of the United States, who became bound to the United States before the passing of this act; but each and every such officer shall, on or before the 30th day of September next, give new and sufficient sureties for the performance of the duties required of such officer. "Sec. 3. That, from and after the 30th day of September next, if any officer employed, or who has heretofore been employed, in the civil, military, or naval departments of the government, to disburse the public money appropriated for the service of those departments, respectively, shall fail to render his accounts, or to pay over, in the manner, and in the times, required by law, or the regulations of the department to which he is accountable, any sum of money remaining in the hands of such officer, it shall be the duty of the first or second comptroller of the treasury, as the case may be, who shall be charged with the revision of the accounts of such officer, to cause to be stated and certified, the account of such delinquent officer, to the agent of the treasury, who is hereby authorized and required immediately to proceed against such delinquent officer, in the manner directed in the preceding section, all the provisions of which are hereby declared to be applicable to every officer of the government, charged with the disbursement of the public money, and to their sureties, in the same manner, and to the same extent, as if they had been described and enumerated in the said section: provided, nevertheless, that the said agent of the treasury, with the approbation of the secretary of the treasury, in cases arising under this or the preceding section, may postpone, for a reasonable time, the institution of the proceedings required by this act, where, in his opinion, the public interest will sustain no injury by such postponement." 3 Story's Laws U. S. pp. 1791–1793, c. 107, [3 Stat. 592].

and stores of purser Timberlake, and other portions out of the ship's stores, for which he, (Lieutenant Randolph,) has not accounted; it being impossible for any one, except himself, to separate the items, as it appears from the statement and vouchers herewith transmitted for the decision of the second comptroller of the treasury thereon." The account was certified by Amos Kendall, fourth auditor, and also by J. B. Thornton, second comptroller of the treasury. There is an unexplained discrepancy between the re-stated account and the warrant, the account claiming $131.34, more than the warrant. This discrepancy, however, does not seem to have attracted the attention, either, of the court or the counsel.

The case was argued by Mr. Robertson, late attorney general of Virginia, and Mr. Leigh, on behalf of the petitioner, and by Mr. R. C. Nicholas, on the part of the United States.

Mr. Robertson said, that as Mr. Nicholas had consented to appear on behalf of the United States, he would now present to the court two documents, that morning received from Washington: they were authentic copies of the accounts of Lieutenant Randolph and of John B. Timberlake, as settled at the treasury, respectively, in 1828 and 1829. Before going into the argument, he would inquire, whether the counsel representing the United States would admit a fact which he considered important to the justice of the case, and believed to be one of general notoriety: That Lieutenant Randolph had never been duly appointed purser, but had temporarily acted in the place of the deceased purser, Timberlake, in pursuance of the verbal order of his commanding officer?

Mr. Nicholas observed, that he appeared in the case at the request of the court, as amicus curiæ, and did not feel himself at liberty to make any admissions.

Mr. Robertson said, he should then insist that the fact sufficiently appeared from the evidence in the case; but if not, that the burden of proof rested on those by whom Lieutenant Randolph had been imprisoned, to show that he was an officer, within the meaning of the law under which the arrest had been made. He would now proceed to lay before the court, the grounds upon which he considered the petitioner entitled to his discharge, under the habeas corpus heretofore awarded. The first position he should endeavour to maintain was, that the act of congress, under colour of which Lieutenant Randolph had been deprived of his liberty, was unconstitutional, null, and void.

Mr. Robertson said, when we looked to the constitution of the United States, we could not fail to be struck with its multiplied provisions for the security of personal rights. Its framers sought, as far as possible, to guard against all abuses of power. With that view, they had secured to the citizen, the privilege of the writ of habeas corpus. They had for-

bidden ex post facto laws, and bills of attainder; laws abridging the freedom of religion, of the press, and of speech. In all criminal prosecutions, they had provided for the accused, a speedy trial before an impartial jury; and had declared that no man should be deprived of life, liberty, or property, without due process of law. He adverted to these provisions of the constitution—there were others equally strong, and more directly apposite to the question before the court, which would be the subject of special notice—as evincing the deep anxiety of its framers, to protect the people against the oppression of the government. Vain, indeed, had all their efforts proved, if the proceedings, now under the view of the court could be upheld, and an American citizen, without a judicial trial, subjected, for any cause, to perpetual imprisonment, by the mandate of a subordinate executive officer.

Among the means adopted to attain the great object in view, was the separation, with some few exceptions, of the legislative, executive, and judicial, departments. By article 2, § 1, it was declared that the executive power should be vested in a president of the United States. By article 3, § 1, that the judicial power should be vested in one supreme court, and such inferior courts, as congress might ordain and establish; and that the judges should hold their offices during good behaviour. The second section of the same article, declares that the judicial power shall extend to all cases in law or equity, arising under the constitution and laws of the United States; and still more definitely, "to controversies to which the United States shall be a party." Does not the law, in question, confer judicial powers on the executive, and give to that department the decision of controversies, to which the United States are a party? It authorizes a comptroller of the treasury to state the accounts of certain officers, and certify the same to the agent of the treasury, (not to the solicitor,) who, thereupon, is required to issue a warrant of distress against the delinquent, and his sureties. The statement of an account, and the issuing of process, it may be contended, requires no exercise of judicial power, but are the appropriate duties of ministerial officers, of commissioners, and of clerks. But commissioners and clerks are the ministerial officers of courts of justice. Their acts may be set aside; or, if approved, become essentially the acts of the courts which sanction them. To state the accounts, and issue the process authorized by the law in question, necessarily implies the exercise of judicial functions. It involves the power to receive or reject evidence; to determine its credibility and competency; to decide all questions of law and fact that may arise; to give a certificate of the sum due, equivalent in its effect to a judgment; and to award final process in the nature of an execution. It cannot be denied, that controverted questions of law and fact

may often arise in the settlement of these accounts. If, to settle such accounts and issue such process be not the proper function of the judiciary, it would be difficult to conceive any controversy whatever, of a civil nature, not between the United States and its officers merely, but between man and man, arising under the constitution and laws of the United States, the cognizance of which might not be wrested from that department, and in the place of judges, versed in the laws, and responsible for the due exercise of their duties, transferred to executive agents holding their offices at the will of one man.

The act of congress, Mr. Robertson contended, was in conflict with that part of the eighth article of amendments to the constitution, which declared, that cruel and unusual punishments should not be inflicted. The fact would scarcely be credited by those who had not examined the subject, that under the warrant it authorized, a public debtor might be consigned to interminable imprisonment. There is no provision for his discharge. The insolvent laws, which give to the secretary of the treasury and to the president, authority in certain cases to liberate public debtors, do not extend to the case of one imprisoned under this treasury warrant. He is placed beyond the reach even of executive mercy, if, indeed, mercy might be expected from those who should pursue him with the rigors of such a statute. There are no means of relief, unless afforded by habeas corpus, or by a special act of congress. The severity of the law will not be defended, on the ground, that it meant to provide a punishment for a criminal default: for in no criminal prosecution can a citizen be deprived of the trial by jury. It will be said, it was intended to afford a civil remedy merely. Still, whatever it may be termed, perpetual imprisonment must be regarded as a punishment —not the less a punishment when inflicted for debt, than when inflicted for crime. It would be regarded as a cruel and unusual punishment for a criminal offence of minor grade: how much more cruel and unusual, when inflicted for that which is not a crime. Or, will it be maintained, that every excess of severity may be constitutionally practised, under the name of civil remedies for civil injuries; and that the payment of debts may be enforced by the peine forte et dure, or other torture, which the constitution does not tolerate as a punishment for the most atrocious offence.

Mr. Robertson said, that the act of congress was also in violation of the fourth article of amendments to the constitution, which emphatically declare the right of the people to be free in their houses, persons, and goods, from unreasonable searches and seizures; and prohibits all warrants, unless upon probable cause, supported by oath or affirmation. If any seizure can be regarded as unreasonable, surely that must be so considered which is made by authority of a subordinate executive officer, consigning an in-

dividual to endless imprisonment, without even the forms of a judicial inquiry. The process is, in the law itself, termed a warrant. It is not required to be issued on probable cause, supported by oath or affirmation. The assertion of a treasury officer is taken for full proof to justify the seizure of body, land, and goods. It may be said that this clause, as well as the one before commented on, applies to criminal cases only. But, what reason is there for so narrow an interpretation of constitutional regulations in favour of liberty? Why shall a warrant in a civil case, not merely to commit, but to incarcerate for life, be founded on slighter evidence than one in a criminal case, issued solely with a view of bringing the party to trial? The warrant of distress, it may be thought, resembles a capias requiring bail. But they are widely different. The requisition of bail is made, subject to the control of a court of justice, which will guard against abuse. The warrant is wholly under the direction of an executive officer. Bail is preliminary to a full and fair investigation. The warrant is final: it supposes the party already tried and condemned, or, rather, condemned without a trial. It is true, he may apply for an injunction—provided he can give security in such sum as the court may require. But security will never be received in a sum less than the amount claimed at the treasury. This, the prisoner may be unable to give, and in proportion as the demand is unfounded and extravagant, will it be difficult for the victim of injustice to obtain a hearing of his complaint.

Mr. Robertson said, there was another provision of the constitution, on which he should rely with still greater confidence. It was the seventh article of the amendments, by which it was declared, that in suits at common law, where the value in controversy should exceed twenty dollars, the trial by jury should be preserved. The framers of the constitution were well aware that this mode of trial did not belong to the courts of equity and of admiralty. But they meant to secure it in all cases of any importance, within the ordinary cognizance of the courts of common law. To say that the case under consideration is not a case of common law, because it is a summary proceeding by executive officers, would be to elude the provision referred to, and to render it a dead letter. Every case at common law, under such an interpretation, may be converted into a summary executive proceeding; and the amendments introduced with the deliberate purpose of securing that mode of trial, in a large and important class of cases, will have left it in the power of congress to abolish it in all cases whatsoever.

Mr. Robertson said, it was impossible the law could be reconciled with the provisions of the constitution to which he had referred. It had violated them by vesting judicial powers in the executive; by transferring to that department the cognizance of controversies at common law—of controversies to which the United States were a party; and by authorizing its subaltern agents to issue warrants, unsupported by oath or affirmation, whereby the person of an American citizen might be seized, and doomed to perpetual imprisonment. But if the court should regard the act of congress, as warranted by the constitution, he should contend that it did not apply to the case, and that the proceedings under it had been altogether irregular. The act applies only to officers who shall have refused to settle and pay. But Lieutenant Randolph settled his account in 1828, and now held the certificate of the proper officer that it was then closed. Admitting, for the sake of argument, there was error in the settlement; the accounting officers had no right, in the mode they had adopted, to open the account anew. If they had, there was no limitation to restrain them from so doing as often as they pleased, and at any distance of time. Such a proceeding might lead to gross injustice and abuse. But had the account in this case been an original account, it was not such as justified the solicitor in issuing a warrant. It should have been one, in the words of the statute, "exhibiting the amount truly due." He referred to other clauses, showing plainly the intent of the law, that this summary proceeding should not be adopted, except where the true balance was precisely ascertained; and the case itself was a striking illustration of the propriety of the restriction. Here was an account comprising large sums heretofore allowed as credits. The two credits in the old account constitute the debits of the new. Two items amounting to upwards of $12,000, were, as the fourth auditor avers, paid in part out of the money and stores of Purser Timberlake, and out of the ship's stores, and are re-charged; that Lieutenant Randolph may show, what part was paid out of his money and stores, and what out of the money and stores of Purser Timberlake. These items are not mentioned to show the obvious impropriety of the treasury officers using this law, as an instrument to adjust the accounts of third persons. They are referred to as an admission, that Lieutenant Randolph was entitled to a part, at least, of the sum charged, and, consequently, that the balance exhibited by the accounting officers and for the recovery of which the warrant of distress had been issued, was not truly due.

Mr. Robertson said, it must be admitted, that the act was one of extreme severity. It was incumbent, therefore, on those who should attempt to enforce it, to bring themselves, in every particular, plainly within its letter. He now proceeded to point out other irregularities. The warrant stated, that Lieutenant Randolph was indebted to the United States, in the sum of $25,097.83. This statement, as he had already remarked, was falsified by the admission in the account. But the objection he meant now to urge, was, that it had not been stated nor shown, on

what account the alleged debt was incurred. It was not every debt, for the recovery of which this summary proceeding was authorized, but such only as should be incurred by officers employed to disburse money appropriated for the service of the civil, military, or naval, departments. The account consisted of sums once credited, and now debited; but these credits, whatever conjectures they might justify, did not disclose the nature of the original debt, against which they had been received as credits, nor was it shown, that that debt was incurred in the disbursement of money appropriated by congress, for any of the departments. Again;—the first item of the account, charges Lieutenant Randolph with upwards of $11.000, for cash received about the 3d of April, 1828, being the amount left by Purser John B. Timberlake. If, in truth, this cash, as stated, was left by Timberlake, how happens it, that it is claimed by the government of the United States? It may be true, that it was actually the very money furnished by the government to the late purser; but that fact does not legally appear, nor is it easy to perceive how such a claim could be maintained. There was no ear mark, he presumed, by which the funds could have been identified, and if not, they passed upon the death of Timberlake, with all other funds from whatever quarter received, to his personal representatives.

There was but one other objection which he should urge against the legality of the proceedings, and it was one which he regarded, of itself, as absolutely fatal. It was, that Lieutenant Randolph was not an officer within the contemplation of the act. He was described in the proceedings as "acting purser." No such officer was known to the law. It would not be pretended, that he had ever been appointed purser. He is charged with having assumed the pursership upon the decease of Purser Timberlake, on a distant station. It was not meant to be denied, that the acting purser was liable to account to the government, or to the representatives of the deceased purser, for the funds he had received. But he relied with full confidence, that a statute, authorizing summary proceedings against a specified class of public officers, could not be extended, by construction, to persons not fairly within its terms. In every point of view, he submitted that Lieutenant Randolph was entitled to his discharge.

Mr. Nicholas, as amicus curiæ, before making any remarks in reply to Mr. Robertson, offered in evidence a letter from the fourth auditor, to Mr. Randolph, dated March 8th, 1833, and one from Mr. Randolph in reply thereto, dated on the twelfth of the same month, containing admissions by Mr. Randolph of certain items charged against him in account, but subject, as he insisted in his letter, to off-sets relied on by him.

The competency of this evidence was denied, by the counsel for Mr. Randolph, upon the ground, that all evidence adduced by the United States should be confined to the warrant, and to the return upon the face of it; and also, upon a distinction which, it was urged, existed between stating an account at the treasury department, and the re-opening of an account by the auditor, which had once been stated there. In the latter case, it was contended, that no admissions, by a party, should be allowed to prejudice him, any more than negotiations between individuals are permitted to do so, which have for their object the adjustment of a controversy, or the effecting of a compromise. This objection was reserved by the counsel for Mr. Randolph, subject to the future opinion of the court.

Mr. Nicholas, in reply to the objections urged by Mr. Randolph's counsel to the admissibility of the evidence, observed, that he was of opinion, that the court had no legal right to examine into the details of the account upon which the warrant was founded, in this incidental manner; but in the event that the court should be of a different opinion, and in order to meet every contingency, he had determined to introduce the evidence to sustain that account.

Mr. Nicholas then proceeded to reply to the argument of Mr. Robertson, and said, that in compliance with a wish expressed by the court, he had assumed the responsibility (and a serious and imposing one he felt it to be) of replying to the able and eloquent counsel who had appeared in support of the present application of Robert B. Randolph, to be discharged from the custody of the marshal. That the little time that had been afforded him for the investigation of the subject, requiring as it did, an examination of numerous acts of congress hitherto new to him, and involving the discussion of many important and interesting questions of constitutional law, was calculated to augment the embarrassment with which he proceeded to discharge the duty that had devolved upon him. But that he derived no inconsiderable degree of encouragement from the reflection, that whatever omissions he might make in the argument, would be amply supplied by the intelligence of the court. He understood the question then submitted for the decision of the court, to be this:—Did the return which had been made by the marshal upon the writ of habeas corpus, by virtue of which, Robert B. Randolph had been brought before the court, set forth a lawful and sufficient cause for his detention in custody? That it had been contended by the counsel who opened the discussion, that the return of the marshal did not exhibit any sufficient reason for such detention, but that, on the contrary he was held in confinement unjustly, and without any lawful authority. He should endeavour to establish the converse of the proposition, and to show that the confinement complained of, and from which a discharge was now

sought, however harsh, unjust, and oppressive it might seem to the imaginations of gentlemen, was, nevertheless, sanctioned and justified by the laws of the United States, and not in conflict with any principle of the constitution, and not more harsh than other proceedings known to the law. That Mr. Robertson had commenced his argument by general and sweeping denunciations of the law, under which this warrant had issued, had represented it as subversive of many of the most valuable provisions of the constitution, destructive of liberty, tending to despotism, annihilating the trial by jury, and utterly at war with the whole spirit of our institutions. That he had then descended to a specification of the various parts of the constitution, with which he supposed it to be in conflict.

Mr. Nicholas said, he would endeavour to vindicate the law from the attacks of Mr. Robertson, by a refutation, in detail, of the various constitutional objections that had been urged. The first objection was founded upon the first and second sections of the third article of the constitution, which declare, that the judicial power of the United States shall be vested in the supreme court, and such other inferior courts as congress may, from time to time, ordain and establish; and shall extend to all cases in law and equity, arising under the laws of the United States, and to all controversies to which the United States are parties. It had been contended that the act of congress under which this warrant issued, was unconstitutional and void, because it conferred a portion of the judicial power upon a subordinate executive officer, whilst the constitution had vested the whole judicial power in the courts of the United States. Mr. Nicholas said, that in deciding whether the power given by the act of congress of May, 1820, to the solicitor of the treasury, to issue warrants like the present, was a constitutional power, it was important, in the first instance, to determine, clearly and distinctly, what was meant by judicial power. The judicial power he conceived to be synonymous with the power of a court of justice: For Blackstone, (volume 3, p. 23), defines (a definition taken from Coke's Littleton), a court to be a place wherein justice is judicially administered. What, then, were the powers of courts of justice? They must be co-extensive with, and limited by the objects for which all courts are instituted and established. That object, as he understood it, in its most enlarged and general sense, was the decision of legal controversies or suits, (either of a civil or criminal nature,) between contending parties. Hence, he said, it followed, as a necessary consequence, that if there be no suit depending for the redress of a civil injury, or prosecution for a public wrong, there can be no exercise of a judicial power; and that, therefore, no act done by a private individual, or by a public

officer, unconnected with any civil suit or criminal prosecution, can be properly or legally regarded as a judicial act. To sustain this position of law, that to call forth the exercise of judicial power, it was essential that there should be a lis pendens, he referred to the distinction taken in 3 Bl. Comm. p. 3, between the redress of injuries which may be obtained by the act of the party, and that to be afforded by the intervention of a court; and contended, that the remedy given to the United States, in the case of a delinquent officer, by the act of 1820, came within the former class. He said, moreover, that it was a remedy founded in reason, and the necessity of the case. He remarked, that there were many analogous cases known to the law; but relied more particularly upon the power of distress for rent, which, he said, bore a strong affinity to that given by the statute; and urged, that rent could not, with justice or propriety, be placed on higher ground, than debts due from a public officer to the government. Nobody ever supposed that a landlord who distrained for rent was performing a judicial act. The law, too, gave him redress by action of debt. He further referred to provisions in the collection laws of the United States.—1 Story's Laws, p. 632, §§ 68, 69 [1 Stat. 677, 678],—as giving an analogous power to certain officers of the customs, even upon bare suspicion, to seize goods.

Mr. Nicholas adverted to the second article of the new constitution of Virginia, as containing a provision analogous to that, which Mr. Robertson had contended, was violated by this law, and which article of the state constitution expressly inhibits an officer of one department of the government from exercising any of the powers belonging to the other departments. But, said he, there are many powers given by our laws to private individuals, and to different executive and mere ministerial officers of the government, more nearly resembling judicial powers, than that given by this act of congress, which have never been regarded as violating the constitution. If bail be not given, when demandable by law, the debtor may be imprisoned at the instance of the creditor. 1 Rev Code, p. 499, § 43. If a writ be returned non est inventus, the plaintiff may either take out a pluries writ, or issue an attachment, to force an appearance, at his election. 1 Rev. Code, p. 504, § 61. Clerks of courts, surveyors, and commissioners in chancery, make out their own fee bills, which have the force of executions, and if not paid when demanded, may be levied upon the goods and chattels of the debtor. The auditor is authorized by law, to settle claims against the state, and appeal is allowed from his decision to the courts: and yet, said Mr. Nicholas, none of the foregoing have ever been regarded as judicial powers. Mr. Nicholas farther contended, that there was a wide distinction between the mere process and the judgment of the

court; that the former was a ministerial, the latter a judicial act; the former the means employed, the latter the end to be attained. That the warrant authorized by the act of congress, is denominated a "summary process" in the act itself. Mr. Nicholas contended, that the second section of the third article of the constitution of the United States, is strictly applicable to suits actually depending, and that as no such suit here existed, the warrant in this case does not contravene that section.

The eighth article to the amendments of the constitution. Mr. Nicholas said, had no application to the case. This is no case of bail, no fine imposed, no excessive punishment inflicted; and Mr. Robertson's fertile imagination could alone have enabled him to discover the connexion. He had said, that although the law did not sanction unusual punishment in terms, yet it had the same effect, by dooming a man to perpetual imprisonment, and peine forte et dure, unless he paid a debt, or gave security. The great oppression of the law and the great hardship of the case, which Mr. Robertson had so earnestly insisted upon, Mr. Nicholas alleged, consisted in the mere fact of requiring security for the payment of a debt, and the amount of that security to be fixed by the court, according to the circumstances of the case. No great hardship, Mr. Nicholas contended, upon one who had received and misapplied the public money, and who knew, or ought to have known, the conditions upon which he accepted the office of purser. He cited instances of equal rigor, which were familiar, and which were yet never regarded as infringements of the constitution.

A judgment by surprise, might be unjustly obtained against an individual who could obtain no redress, either by injunction or appeal, without giving bond and security; and a man could not receive a legacy without doing the same. Mr. Nicholas contended, that the fourth article of the amendment to the constitution was not violated by the law, under which this warrant was issued. That article, he insisted, applies only to criminal cases, and not to proceedings for the recovery of debts; and, in illustration of this position, he referred to the tenth article of bill of rights of Virginia, containing an analogous provision, and clearly confined to criminal cases. The case Ex parte Burford, 3 Cranch [7 U. S.] 448, to which Mr. Robertson had referred in support of this objection, was a criminal case. In reply to the objection founded upon the provisions of the seventh article of the amendments to the constitution, declaring that in all suits at common law, the right of trial by jury shall be preserved, Mr. Nicholas insisted, that the act of congress did not, in the slightest degree, encroach upon that right;—that he felt as sincere a veneration as the opposing counsel could do, for that invaluable mode of trial, which he certainly regarded as the safest mode of investigating truth, ever devised by the wit of man; and as the chief bulwark of liberty in every country where it had been adopted. He said, that the article referred to, applied only to suits actually depending at common law, as contradistinguished from admiralty causes, and suits in equity. Because the right of trial by jury, is guarantied by the constitution, it by no means followed, he urged, that there was no other legitimate mode of deciding controversies, and ascertaining the respective rights of contending parties. On the contrary, every lawyer, and every man of ordinary intelligence in the community knew, that the most important questions of property, involving thousands of dollars, were every day decided, without the intervention of juries. In the courts of admiralty, and in the chancery courts, in a great variety of motions allowed by law, and upon arbitration, this is known to be the case. But, said Mr. Nicholas, there is another conclusive answer to this objection, and that is, that in this very case the party may have the benefit of a jury trial; for the act provides, that if any person shall think himself aggrieved by any warrant under this law, he may obtain an injunction to the warrant, which shall be conducted according to the principles of a court of equity, which courts, we all know, have the power, when they may deem it necessary, to establish any controverted fact, to invoke the aid of a jury.

Mr. Nicholas continued, that he had now, he believed, answered all the objections urged by Mr. Robertson, growing out of a supposed conflict between the acts of congress, and the constitution of the United States, and it only remained for him to examine some objections founded upon what Mr. Robertson regarded as irregularity in the proceedings. That gentleman, he said, had contended, that as this was an extremely harsh and rigorous law, the court was bound to give to it the strictest possible construction, and to see that it was literally pursued. He then objected, that the warrant, did not aver a failure to settle his account in the manner required by law; but, said Mr. Nicholas, the act authorizes the warrant not only upon failure to settle his account, but also on failure to pay over the money, which last is expressly averred in the warrant. It had been objected by Mr. Robertson, that this was a settled account, and that the officers of the treasury, had no right to open settled accounts, as otherwise, there never would be an end of investigation; but it was urged by Mr. Nicholas, that although the account was settled upon the treasury books, the government was not concluded thereby. The settled account does not embrace debits included in this account; and although he may have fairly disbursed and accounted for, all the money with which he was charged on that account, it does not exonerate him from responsibility in regard to sums not included in the former account, but with which he is properly chargeable, and for

which, he admits himself justly chargeable, in his letter of the 12th of March, 1833, which has been read to the court.

It had been further objected, that this was not such a stated account as warrants this process, because it should show what amount was really due to the United States, and not merely what was claimed; and that a part of the charge of $10,000 was admitted, upon the face of the account, not to be due; but, said Mr. Nicholas, Randolph has admitted the correctness of the charge, and he is liable, moreover, upon the principle of the confusio bonorum, whereby, when one man wilfully mixes his goods with another's, in such a way as to prevent them from being distinguished, the individual, who produces this confusion, shall bear the whole loss. 2 Bl. Comm. 405. Mr. Robertson had contended, that this account was not stated by the proper officer; but, to disprove this proposition, Mr. Nicholas referred to Ingersoll's Digest, pp. 7, 8, "Accounts," §§ 4, 9. In reply to an objection, that the warrant did not aver a failure to pay over the money within the time required by law, it was insisted, that the warrant referred expressly to the law, and was sufficiently certain. And, in regard to the allegation that the warrant did not specify upon what account, or for what particular department of the government the appropriation was made, Mr. Nicholas contended that it clearly appeared from the face of the warrant, and also from Randolph's own admissions, that it was on account of the navy department.

Mr. Nicholas contended, moreover, that the court upon the return of a habeas corpus, will not look into the regularity of the proceedings upon which a judgment is founded, in pursuance of which, a party is taken into custody; but that they will only inquire, whether a sufficient probable cause existed, to warrant the commitment, and that in a case of this sort, they have not the powers of a court of error; in support of which positions, he referred to Rex v. Suddis, 1 East, 306, and to U. S. v. Johns, 4 Dall. [4 U. S.] 412. Mr. Robertson had contended that the warrant contained no such description, and that there was no proof that Randolph was such an officer as was contemplated by the act; that he was described as "acting purser;" that he could not have been a regular purser, because he assumed the duties immediately upon the death of Timberlake in the Mediterranean, and could not, therefore, have been regularly appointed. In answer to which suggestion of Mr. Robertson, Mr. Nicholas laid down this principle of law; that whenever it is manifest that a party has acted in discharge of the duties of an office, and is an officer de facto, although there may be no proof of any regular appointment, he is, nevertheless, as responsible for his acts, as if he had been appointed in the most formal manner. In support of which position, he referred the court to the following cases: Ber-

ryman v. Wise, 4 Term. R. 366; Potter v. Luther, 3 Johns. 431; and People v. Collins, 7 Johns. 549. He also referred to 5 Bac. Abr., for this position, that every man is a public officer, who hath any duty concerning the public. Mr. Nicholas adverted, in illustration of the principle contended for, to the case of an executor de son tort, who derives no authority from the testator, but who assumes the office by his own intrusion and interference; and yet is held responsible in law for all his acts connected with the estate, equally with an executor who had been regularly appointed and qualified.

But, said Mr. Nicholas, Mr. Robertson has admitted Randolph's liability to a certain extent, but contends that he is not amenable to this process; but if he is liable at all, he must be subject to all the obligations annexed to the office; which he held de facto, if not de jure. The case of Auditor v. Dryden, referred to by Mr. Robertson, in 3 Leigh, 703, has no application to the case. The warrant was directed to the marshal of the Eastern district of Virginia, and it was necessary to aver in the warrant, that Randolph resided in the district. Writs of capias ad respondendum never describe defendants as residents of any particular county, though the law requires them to issue, in the first instance, to the county where the defendants reside. Mr. Nicholas referred to 3 Story. Laws, 1622, to show that the laws of the United States intended to provide for the cases of pursers on distant service, who might act without giving bond and security; and he contended, that the necessity of the case required, that naval commanders should have the power of appointing temporary pursers, in case of the death of a regular purser.

Mr. Nicholas concluded by remarking, that the act of congress, under which this proceeding was instituted, had been in force for thirteen years, and that it had been acted upon in this state, on at least two former occasions, viz.: in the Case of Taylor [unreported] and the case of Robertson v. Miller [Case No. 11,926] the collector at Petersburg: and he thought it more than probable, that it had been enforced in other states, but that this was the first time it had ever been resisted as unconstitutional; it seemed, however, to be the fashion of the times, to raise constitutional questions, and to nullify acts of congress.

Mr. Leigh concluded the argument on behalf of the petitioner.

Before MARSHALL, Circuit Justice, and BARBOUR, District Judge.

BARBOUR, District Judge. This is a habeas corpus, issued by this court, upon the application of Robert B. Randolph, alleging that he was imprisoned by the marshal of the Eastern district of Virginia, without lawful authority. The marshal returns as the cause of the detainer of the party, a warrant of distress, issued by the solicitor of

the treasury of the United States, against Randolph, for a sum of money, stated in the warrant to be due from him to the United States, and which he has failed to pay in the manner, and at the time required by law; which warrant was issued under the third section of the act of the 15th of May, 1820, concerning the treasury department. From the warrant, and the account annexed to it, and referred to, as part of it, it appears that the sum claimed from the party, is claimed as being due from him, a lieutenant in the navy, as acting purser, on board the frigate Constitution, for his transactions in that character in the year 1828. It appears, from another document produced by the party, duly authenticated by the fourth auditor, and sanctioned by the comptroller, that Randolph had, in October, 1828, settled his account as acting purser on board the Constitution; but, notwithstanding this previous settlement, the account on which the warrant of distress was issued, under which the party is imprisoned, is one stated at the treasury of the United States, in February, 1833, against him as late acting purser of the frigate Constitution, for the same period embraced in the account above mentioned to have been settled in October, 1828; the present fourth auditor of the treasury, having opened the former account, and re-stated it, so as to produce the result stated in the account of February, 1833, before mentioned, upon the ground, as appears from the face of this last account, of the subsequent discovery of errors and omissions, since the settlement of that of 1828.

Upon this state of facts, the party's counsel have argued, that he is entitled to be discharged; and in the course of the argument, have brought into discussion, many and various points, the first of which is of the gravest import: it calls in question, directly, the constitutionality of the act of congress, under which this proceeding is had. The decision of a question of this sort, is certainly the highest, and most solemn function, which the judiciary could be called upon to perform; for, as was said with sententious brevity by the court, in one of the earliest cases on this subject, it involves the inquiry, whether the will of the representatives, as expressed in the law, is, or is not, in conflict with the will of the people, as expressed in the constitution. Great, however, as is the responsibility involved in this exercise of judicial power, I should meet it without difficulty, if it were necessary to the decision of this cause. But I fully concur in the sentiment of counsel, that whilst, on a proper occasion, it ought to be met with firmness, on the other hand, it is the part of wisdom, to decline the decision of such a question when not necessary.

From the view which I have taken of this case, I do not consider it necessary, and shall therefore pass it without further remark. It is wholly irrelative to the merits

of this case, to inquire, whether there may not have been error committed by the auditor, in the stating of the account, on which this proceeding is founded; because, we are not sitting here, to reverse this case, as an appellate court, on a writ of error, nor, is it before us, as the proceedings of special jurisdictions in England are before the king's bench, by certiorari. In either of those aspects, the decision which we should be called upon to make, would depend upon the result of the inquiry, whether there was, or was not, error in the proceedings; but, sitting as we are, upon a habeas corpus, the question is not, whether there is error in the proceedings, but, whether there was jurisdiction of the case, in the auditor of the treasury. It was settled as early as the great Marshalsea Case, in 10 Coke, 76, and the principle has never been departed from, that where a court has jurisdiction, and proceeds in verso ordine, or erroneously, there the proceeding is only voidable; but where the court has not jurisdiction of the case, there the whole proceeding is coram non judice, and void: the books, both English and American, abound in cases exemplifying this principle. But a habeas corpus will not lie, where the imprisonment is under voidable process, but only where it is merely void; for void process is the same thing as if there were none at all; and then the party is in effect imprisoned, without any authority whatever. Hence, the question would seem naturally to arise, whether the auditor had jurisdiction in the case—in other words, whether the person and the subject matter are such as to bring the case within the provisions of the act of congress—for these are the criteria of jurisdiction. This question was elaborately argued at the bar, and I have considered it with great care. I forbear, however, to enter into the discussion of it here; because, although it should be clearly made out, that the auditor had once had jurisdiction, yet upon the facts in this case, another question arises, which, in my opinion, is decisive of the case; and that is, after the auditor shall once have settled an account of a public officer, and closed it, as in this case, is it competent for him at an after time, upon an allegation of error, or omission, or for other cause, to open it, restate it, and upon the account thus re-stated, to institute proceedings by a warrant of distress against the debtor? I think it is not. Let us try the question by reference to some analogous cases. I take it to be a sound principle, that when a special tribunal is created, with limited power, and a particular jurisdiction, that whenever the power given is once executed, the jurisdiction is exhausted and at an end—that the person thus invested with power is, in the language of the law, functus officio. This proposition is, I think, sustained by the case in 6 Bing. 85, where it is said by the court, that when a magistrate, who has power to convict, has

once convicted, his jurisdiction is at an end—he is functus officio.[3] Could he, at any after time, upon some supposed error, quash, or in any way impair, the efficiency of his own conviction? Suppose a controversy to have been submitted to arbitrators, and that they had made a final award, and delivered it, could they afterwards, on their own mere motion, change, or set aside their own award? Lest, however, it might be supposed that there might be any thing peculiar in this case, by reason of their being judges of the parties' own choosing, let us suppose some cases of special jurisdiction, or powers given by law. Under the acts imposing direct taxes, assessors were appointed to value the lands and slaves of the country, with a view to a just apportionment. After they had made and completed their assessment, so that it was once communicated, agreeably to the requirements of the law, could they afterwards, in any manner, have altered it, so as to change the valuation? Suppose that commissioners of bankruptcy had once decided in a given case—that the party was a trader, that he had committed an act of bankruptcy—and had, in all respects, completely executed the power conferred upon them, could they afterwards, by their own authority, have vacated, or set aside their act? Finally, suppose that the commissioners appointed (under any one of the treaties, under which we procured an indemnity from Spain, France, or Naples,) to adjudge the claims of our citizens, had fully executed that trust—had made and announced an entire distribution of the fund; could they, at an after time, have varied their own adjudication? In all the cases which I have put, I inquire into the power of the special jurisdiction, of its own mere authority to alter or impair, what they had done. Examples might be indefinitely multiplied; these are sufficient to illustrate my idea, viz., that whenever a special jurisdiction has once executed the power with which it was invested, their power is at an end, as to the subject in relation to which it has been executed. Let us trace the injurious consequences of a contrary doctrine. Until the power of the auditor is once executed, the officer knows that it is his duty to account, and having accounted, to pay. But if, after the account had once been stated and closed, he could open it again, how often, and within what period of time, shall he do it? There is obviously no limitation, either as to length of time, or to frequency. Suppose that after once stating it, and then opening it, and re-stating it upon alleged error, he should think he had discovered error, he must open and re-state it again. It will be observed, too, that though the auditor in this case did give the party notice, the law does not require it; unless,

therefore, he shall be restrained to one settlement, it would be competent to him, years after the death of the original party, without notice, in the absence of his representatives, who might be dispersed through the United States, and in the absence of all proof on their part, to resettle the account in a manner which would produce great injustice. But, again: If it be competent to him to open the account in favour of the United States, the converse of the proposition must be equally true, upon the principles of justice; it must be competent to him also, after the lapse of years, to open it against the United States, and in favour of the party. Might not this course most injuriously affect the public interest? It seems to me, that a doctrine, which leads to such consequences, cannot be sound; and that the government is not without ample remedy, though this power shall be denied to the auditor. I suppose there can be no doubt, that a bill in equity would lie, to surcharge and falsify, as in case of a settled account between individuals; and moreover, according to the doctrine of the supreme court (Perkins v. Hart, 11 Wheat. [24 U. S.] 237), even at law, although a settled account would be prima facie evidence, yet it could recover, upon proving mistakes or omissions, any sum, of which it had been thus unjustly deprived. Nobody doubts the power of the auditor to settle the accounts of the public officers from time to time, as they shall fail to account, or pay, any sums accruing after previous settlements; the objection is, to resettling an account once settled, and which must have imported to have been a full and final settlement, at the time when made; for the law requires that to be done.

I have felt some difficulty upon the question, whether a habeas corpus could be sustained in favour of a party imprisoned under civil process, as in this case. The difficulty arose from the doubt expressed by two high authorities, although decided by neither. In Ex parte Wilson, 6 Cranch [10 U. S.] 52, the party was arrested by a capias ad satisfaciendum, and was in prison bounds. An application was made for a habeas corpus, on the ground, that the creditor had refused to pay his daily allowance. The court said it was not satisfied that a habeas corpus was the proper remedy, in a case of arrest, under civil process. In Cable v. Cooper, 15 Johns. 152, the supreme court of New York, except one of the judges, express the same doubt, and refer to the case in Cranch. The judge, in delivering the opinion of the court, says, if it were necessary to decide the point, he should say, it would not lie in such a case.

I suppose that, probably, the doubt originated from this fact. The celebrated habeas corpus act of 31 Charles II., which, as Judge Kent, in his Commentaries, says, is the basis of almost all the American statutes on the subject, and which, in practice, by reason

---

[3] Crepps v. Durden, 2 Cowp. 640, cited and approved by the court in Mills v. Collett, 6 Bing. 85; 19 E. C. L. 11–14.

of its valuable provisions for insuring speedy action, has almost superseded the common law, has been held in England to be confined to criminal cases. All the judges of England in answer to a question propounded to them by the house of lords, answered: That it did not extend to any case of imprisonment, detainer, or restraint whatsoever, except cases of commitment for criminal, or supposed criminal matters. 3 Bac. Abr. 438, note. At the same time this question, in substance, was put to them: whether if a person imprisoned apply for a habeas corpus ad subjiciendum, at common law, and make affidavit that he does not believe that his imprisonment is by virtue of a commitment, for any criminal, or supposed criminal matter, would such affidavit, as the law then stood, be probable cause for awarding the writ? The question being objected to, was not put. This would seem to leave the point in an unsettled state. Yet there are two books of authority, which, I think, sustain the doctrine, that the writ is not confined to criminal cases. Blackstone, in volume 3, p. 132, says, that the great and efficacious writ in all manner of illegal confinement is the habeas corpus ad subjiciendum. Bacon (volume 3, p. 421) says: Whenever a person is restrained of his liberty, by being confined in a common jail, or by a private person, whether it be for a criminal or civil cause, he may regularly, by habeas corpus, have his body, and cause, removed to some superior jurisdiction, &c.

Now, the act of congress, authorizes us to issue the writ, "for the purpose of inquiring into the cause of commitment." Upon this, the supreme court, in Ex parte Watkins, 3 Pet. [28 U. S.] 201, remarks, "that no law of the United States prescribes the cases in which this great writ shall be issued, nor the power of the court over the party brought up by it. The term is used in the constitution, as one which is well understood. This general reference to a power which we are required to exercise, without any precise definition of that power, imposes on us the necessity of making some inquiry into its use, according to that law, which is, in a considerable degree, incorporated in our own." If, in making this inquiry, we were to consult the British statute alone, we should find it, as already stated, confined, in its construction, to criminal cases. But, if we look to the common law authorities which I have mentioned, it seems to me, that we are justified in applying it to a case of civil process. Indeed, we know it to have been repeatedly applied in England to the domestic relations of life, such as the liberation of a wife from the unjust restraint of a husband, and a child from that of a parent. And certainly, we are well warranted in making this reference to the common law; because, although it is admitted by all, that it is not a source of jurisdiction, yet it is habitually, rightfully, nay, necessarily referred to for the definition and application of terms; indeed, there are many terms in the constitution, which could not otherwise be understood. Nor do even the doubts expressed in the cases from Cranch and Johnson, apply to this; for both of those were on process of civil execution, issuing from a court of record and general jurisdiction; whereas, this is a case of process, issuing from a special jurisdiction, which can neither be supervised by certiorari, nor re-examined by writ of error. In this case, then, if a habeas corpus would not lie, there would be no relief from imprisonment without lawful authority. In cases of execution from courts of record, the courts themselves can quash it, if it do not conform to the judgment; if it do, and that judgment be erroneous, it can be corrected in a court of appellate jurisdiction. Upon the whole view of the subject, I am of opinion that the party should be discharged.

MARSHALL, Circuit Justice. Robert B. Randolph, late acting purser of the frigate Constitution, was brought into court, on a writ of habeas corpus, and a motion is now made for his discharge from imprisonment. The writ was directed to the marshal of this district, in whose custody he is. The return of the officer, shows the cause of caption and detention, to be a warrant issued by the accounting officers of the treasury, under authority of the act passed the 15th day of May, 1820; which, after reciting that Robert B. Randolph, late acting purser of the United States frigate Constitution, stands indebted to the United States in the sum of $25,097.83, agreeably to the settlement of his account, made by the proper accounting officers of the treasury, and has failed to pay it over according to the "act for the better organization of the treasury department," commands the said marshal to make the said sum of $25,097.83 out of the goods and chattels of the said Randolph; and in default thereof, to commit his body to prison, there to remain until discharged by due course of law. If these proceedings fail to produce the said sum of money, the warrant is to be satisfied out of his lands and tenements. The return shows that the body of the said Robert B. Randolph was committed to prison, and is detained by virtue of this process.

Several objections have been taken to the legality of the warrant; the first and most important of which is, that the act of congress, under the authority of which it issued, is repugnant to the constitution of the United States. If this objection be sustained, the warrant can certainly convey no authority to the officer who has executed it, and the imprisonment of Mr. Randolph is unlawful. The counsel of the prisoner rely on several parts of the constitution, which they suppose to have been violated by the act in question. The first section of the third ar-

ticle, which establishes the judicial department, and the seventh amendment, which secures the trial by jury in suits at common law, are particularly selected as having been most obviously violated.

No questions can be brought before a judicial tribunal of greater delicacy than those which involve the constitutionality of a legislative act. If they become indispensably necessary to the case, the court must meet and decide them; but if the case may be determined on other points, a just respect for the legislature requires, that the obligation of its laws should not be unnecessarily and wantonly assailed. The act of congress, under the authority of which the process by which Mr. Randolph is imprisoned was issued, makes it the duty of certain officers of the treasury to settle, and cause to be stated, the account of any collector of the revenue, &c., who shall fail to render his account, or pay over the same in the manner, or in the time required by law, exhibiting truly the amount due to the United States, and certifying the same to the agent of the treasury, who is authorized, and required to issue a warrant of distress against such delinquent officer and his sureties, directed to the marshal of the district in which such delinquent officer and his surety, or sureties shall reside; which officer is commanded to make good the money appearing to be due to the United States, by seizing, and selling the goods and chattels of such delinquent officer and his sureties, and by committing the body of such delinquent officer to prison, there to remain until discharged by due course of law.

If this ascertainment of the sum due to the government, and this issuing of process to levy the sum so ascertained to be due, be the exercise of any part of the judicial power of the United States, the law which directs it, is plainly a violation of the first section of the third article of the constitution, which declares, that "the judicial power of the United States shall be vested in one supreme court, and in such inferior courts as congress shall from time to time ordain and establish. The judges, both of the supreme and inferior courts, shall hold their offices during good behaviour." The judicial power extends to "controversies to which the United States shall be a party." The persons who are directed by the act of congress to ascertain the debt due from a delinquent receiver of public money, and to issue process to compel the payment of that debt, do not compose a court ordained and established by congress, nor do they hold offices during good behaviour. Their offices are held at the pleasure of the president of the United States. They are, consequently, incapable of exercising any portion of the judicial power, and the act which attempts to confer it, is absolutely void. In considering the validity of this act, therefore, it is necessary to discard every idea of its con-

ferring judicial power. We must not view the statement or certificate of the account as a judgment, or the warrant which coerces payment, as judicial process. They must be viewed as mere ministerial acts performed by mere ministerial agents. They cannot be otherwise sustained.

I will, for the present assume, that the power of collecting taxes, and of disbursing the money of the public, may authorize the legislature to enact laws by which the agents of the executive may be empowered to settle the accounts of all receiving and disbursing officers, and to issue process in the nature of an execution, to compel the payment of any sum alleged to be due. But these agents are purely ministerial, and their acts are, necessarily, to be treated only as ministerial acts. The inevitable consequence is, that their validity must be decided by those legal principles which govern all acts of this character. These require, that the authority, whether given by a legislative act, or otherwise, must be strictly pursued. Such agents cannot act on other persons, or on other subjects, than those marked out in the power, nor can they proceed in a manner different from that it prescribes. This is a general rule, applicable to such cases generally; it applies with peculiar force to that now before the court. I will not attempt to detail the severities and the oppression which may follow in the train of this law, if executed in contested cases. They have been brought into full view by counsel, in their arguments, and I will not again present them. It may be said with confidence, that the legislature has not passed any act which ought, in its construction, to be more strictly confined to its letter. By this rule its words will be examined.

The first objection to this warrant is, that Mr. Randolph is not one of those persons on whom the law was designed to operate. The act does not declare that every debtor of the public shall be subject to this summary process. The particular persons against whom it may be used are enumerated. Those stated in the second section are. "any collector of the revenue, receiver of the public money, or any other officer who shall have received the public money, before it is paid into the treasury of the United States." The obvious construction of these words is, I think, that they describe persons who hold offices under government, to whose hands the public money comes before it reaches the treasury. A collector of the revenue is an officer of this description; so is a receiver of the public money; and the following words, "or other officer who shall have received the public money before it is paid into the treasury of the United States," demonstrated the kind of persons who were in the mind of the legislature. The subsequent words preserve the idea, that regularly appointed officers only were intended. The word officer, is retained, and is regu-

larly used throughout the section, showing plainly, that no other debtor than one who was properly designated by the term officer, was contemplated by the act. Throughout the section, too, the sureties of such officer are regularly connected with him, and subjected to the same process, so far as respects their property. I do not mean to say, that the liability of the officer is made to depend on his having actually executed an official bond with sureties. I do not mean to say that an officer, regularly appointed, who should receive the money of the public before the execution of his bond, might not be liable to this treasury execution. But I mean to say, that this language proves incontestably that the legislature contemplated those officers only, who were required to give bond with surety, as the objects of the law. The sureties are spoken of throughout, as inseparable from the officer, as existing whenever the officer exists. This section does not comprehend the case of a purser in the navy, but I have thought it necessary to enter into its exposition; because it has a material bearing on the third section, which does comprehend persons of that description.

The third section enacts, "that if any officer employed, or who has been heretofore employed in the civil, military, or naval departments of the government, to disburse the public money appropriated to the service of these departments, shall fail to render his accounts, or to pay over in the manner, and in the time required by law, or the regulations of the department to which he is accountable, any sum of money remaining in the hands of such officer, it shall be the duty," &c. To what persons does the word officer, as used in this section, apply? Is it to every commissioned officer in the army or navy of the United States, to whose hands any public money may be intrusted, or is it to those officers only, whose regular duty it is to receive and disburse the public money, and who are appointed for that purpose? The language of the sentence, I think, answers these questions to a reasonable certainty. It is "any officer employed to disburse the public money appropriated to the service of these departments respectively." A military or naval officer is employed for military or naval duties, not to disburse the public money appropriated to the service of his department. I cannot suppose, that a military or naval officer to whose hands, money belonging to the public may come, is, from the words of the act, more liable to this summary and severe proceeding, than any individual not bearing a commission, to whom the same money might be confided for similar purposes. The subsequent words of the sentence, "shall fail to render his accounts, or to pay over in the manner and in the time required by law, or the regulations of the department to which he is accountable," &c., also convey the idea that a regular disbursing officer, whose duty was prescribed

by law, or by the regulations of the department, was contemplated. This idea is still more strongly supported by that part of the section which adopts all the provisions of the second section, and applies them to the sureties of the officer who is designated by the act, as well as to the officer himself. I think, then, the fair construction of the law is, that regularly appointed officers who are required to give official bonds, were alone contemplated by the legislature. If we take into consideration the character and operation of the act, the extreme severity of its provisions, that it departs entirely from the ordinary course of judicial proceeding, and prescribes an extreme remedy, which is placed under the absolute control of a mere ministerial officer, that in such a case the ancient established rule is in favour of a strict construction; my own judgment is satisfied that this is the true construction.

Was Mr. Randolph an officer of this description? The process, by authority of which he is in prison, designates him as "Robert B. Randolph, late acting purser of the United States frigate Constitution." The word acting, qualifies the word purser, and shows that he did not hold that office under a regular appointment, but for the time being, during the existing emergency. The omission to include his sureties in the warrant, as the law directs, shows that he had given no sureties; and this fact, unexplained, is evidence that no official bond, with sureties, was required. It might be added, that the explanatory accounts, to some of which reference is made in the warrant, prove with sufficient clearness that Mr. Timberlake was purser of the frigate Constitution, then cruising in the Mediterranean, and that on his death, Lieutenant Randolph was directed to perform the duties of purser during the cruise. It is then apparent, that he was a mere acting, and not a regular purser.

Mr. Nicholas has contended, with much plausibility, that having taken upon himself the office, he takes upon himself also all its responsibilities. This argument is true to a certain extent, and, as far as respects responsibility alone, is unanswerable. In a regular proceeding against Mr. Randolph, no person will be hardy enough to deny his responsibility to the same extent as if he had been a regular purser. It is not his responsibility to the United States, but his liability to this particular process, which is the subject of inquiry. Is a mere acting purser designated by this law as one of those officers against whom this summary process may be used? It is in vain to say that he comes within the same reason, and is within the mischief against which the statute intended to provide. The statute does not reach all public debtors, and has selected especially those for which it is intended. No others can be brought within its purview. Those principles of strict construction, which

apply, I think, to all laws restrictive of common right, forbid it. These reasons satisfy my own judgment, that Mr. Randolph was not an officer to whom the law applies the process under which he is imprisoned. If it were necessary to assign any reasons for this distinction between temporary and permanent officers, it would not be difficult to find them. The permanent officer usually receives his money from the treasury, or by its order, so that the document which charges him, appears on the books of that department. The temporary officer will seldom be placed under the same circumstances. He may, and generally does, receive the money with which he is chargeable, in such a manner as to leave the amount a subject of controversy. In this particular case, Purser Timberlake must stand charged, I presume, with all the moneys advanced to the purser of the Constitution. The portion of this money which came to the hands of Mr. Randolph, would not appear on those books, and may be a matter of controversy between him and Timberlake's representatives. Congress might very reasonably make a distinction, when giving this summary process, between an officer whose whole liability ought to appear on the books of the department, and an agent whose liability was most generally to be ascertained by extrinsic testimony. But it is enough for me, that the law, in my judgment, makes the distinction.

The accounts extracted from the books of the treasury, and laid before the court, furnish other matter for serious consideration. The second section of the act requires, that the account stated by order of the first comptroller of the treasury, "shall exhibit truly the amount due to the United States." For what purpose was the word "truly" introduced? Surely not to prohibit the officers of the government from exhibiting an account known to be erroneous. Congress could not suspect such an atrocity. Its introduction, then, indicates the idea, that this summary process was to be used only when the true amount was certainly known to the department; when the sum of money debited to the officer appeared certain, and either no credits were claimed, or none about which a controversy existed. The amount due to the United States cannot be truly exhibited when the claim is shown by the account itself, to exceed what is really due. I do not mean to say, that the debtor is not bound to show with precision, the credits to which he is entitled. I do not mean to say how far his failure to separate payments made from his own funds, and from those of his predecessor, may deprive him in a suit at law, of the credits he claims. I mean to say, only, that the amount claimed, is not the sum truly due to the United States, if the account itself, shows that a smaller amount is due. The necessity of withholding the credit, may justify proceeding against the debtor in a court

of justice, in which he must make good his credits; but will not, I think, justify issuing an execution, without any judicial inquiry, against the body and estate of the delinquent, for a sum confessedly more than is due. The third section omits the word "truly," but requires that the account shall be stated, and directs the agent of the treasury to proceed in the manner directed in the preceding section, all the provisions of which, are declared to be applicable to every officer of government, chargeable with the disbursement of public money.

It may be contended, that the provisions of the preceding section, thus adopted in the third, are those only, which relate to proceedings after the account is stated. But I do not think this the fair construction of the statute. I think the legislature can no more have intended in the one case than in the other, that a treasury execution should issue for confessedly more than is due, by which the person of the debtor should be imprisoned, probably interminably, and his property sold. Congress must have designed to leave such cases to the regular course of law.

If these principles be correct, let them be applied to the case before the court. Mr. Randolph is charged in the account on which the warrant issued, with cash left by Purser Timberlake, on board the frigate Constitution, and, according to his own confession, received by him, $11,483. That he must account for this sum is certain. I shall not inquire now whether the treasury might issue an execution for it, or ought to have applied to a court of justice. I will proceed to other items of the account. He is re-charged with slops issued by him, which belong to the estate of Mr. Timberlake, as appeared by his books. Is this to be settled at the treasury, under this act of congress, or does the inquiry properly belong to a court of justice? He is charged with German linen, belonging to his private stores, which he turned into the navy store at Charleston, as slops. This item had been allowed to him on a former settlement of his accounts. It is not alleged that this linen has been returned to him. The United States may, and probably have, used it. Whether he is entitled to any, and to what credit, for this item, is a proper inquiry for a court of justice. The treasury may refuse the credit, and refer the question to a court of justice, but cannot, I think, issue an execution for it, as the case now stands. The material item allowed in a former settlement of accounts and now re-charged, is the amount of advances on his pay-roll to officers and men, while he acted as purser of the Constitution. It now appearing by the memoranda of sales, by the evidence of Commodore Patterson, and others, and by the general state of the account, that portions of these advances were made out of the money and stores of Purser Timberlake, and out of the ship's stores. I will not make the obvious objection to this item, that if Mr. Ran-

dolph paid the money, or sold the stores of Mr. Timberlake on his own account, he is responsible to the estate of Mr. Timberlake, and that the treasury department of the United States does not represent him, nor that credits given for money paid by Mr. Randolph as his own, cannot be rescinded by alleging that the money really belonged to another person; nor will I inquire by what authority the treasury department settles the accounts between Timberlake's representatives and Randolph. But I will say, that this entry admits, that part of the money was paid by Randolph out of his own funds, and certainly diminished his debt to the United States to that amount. Consequently, the whole amount for which execution issued was not due.

If I am correct in saying that this summary process can be used only to coerce the payment of the sum actually due, not to coerce the payment of more than is due, that such controverted question ought to be decided in a court of justice; then this warrant has been issued in a case which the law does not authorize; in a case which ought to have been submitted to a court of justice. On both these points I am of opinion, that the agent of the treasury has exceeded the authority given by law, and consequently that the imprisonment is illegal.

I have not had time to state my opinion on the remaining point on which my brother judge has given his opinion. It is of no importance, as I concur with him on it. Mr. Randolph is to be discharged from custody.

