## IN RE BURRUS, Petitioner.

ORIGINAL.

No. 10.   Original.   Submitted March 10, 1890. — Decided May 19, 1890.

A District Court of the United States has no authority in law to issue a writ of *habeas corpus* to restore an infant to the custody of its father, when unlawfully detained by its grand-parents.

THE case is stated in the opinion.

*Mr. G. M. Lambertson* for the petitioner.

*Mr. John Schomp* opposing.

MR. JUSTICE MILLER delivered the opinion of the court.

This is an application by Thomas F. Burrus to this court, in the exercise of its original jurisdiction, for a writ of *habeas corpus* to relieve him from the custody and unlawful imprisonment, as he declares, in which he is held by Brad. D. Slaughter, United States marshal of the State of Nebraska, in the jail at Omaha in said State, by virtue of an order of the District Court of the United States for that district. Upon the filing of the petition in this court, a rule was entered and served upon Slaughter to show cause why said writ of *habeas corpus* should not issue. To this rule Slaughter made return. In this return he says that " the said petitioner is in his custody under and by virtue of an order and judgment of the Honor-

able Elmer S. Dundy, Judge of the United States Court for the District of Nebraska, a copy of which order is hereto attached, and forms a part of this my return to aforesaid writ." He further attaches to this return a " true and correct copy of the whole proceedings in the controversy that brought about the judgment and order aforesaid, and he holds the said Thomas F. Burrus in his custody subject to and in pursuance of the aforesaid order and said judgment of the court, and submits whether he is entitled to his discharge as prayed for." This return is signed " Brad. D. Slaughter, marshal of the United States for the District of Nebraska."

The substance of this record shows that Louis B. Miller, of the town of Oxford, county of Butler, and State of Ohio, and a citizen of that State, was the father of a child named Evelyn Estelle Miller, who was born on the 7th day of October, 1881; that his wife died on the 18th of May, 1882, while he and his wife were residing in Nemaha County, in the State of Nebraska; and that while his wife was lying sick of measles, from which she ultimately died, the child was taken, under the directions of a physician, to the residence of the grandfather, Thomas F. Burrus, and Catherine Burrus, his wife, who were, and now are, residents of said Nemaha County and citizens of the State of Nebraska. Since that time, Miller has married again, and, having a house and home, and being well prepared to take care of his child, he has desired its care and custody, and made frequent demands of the said Thomas and Catherine Burrus that they deliver it up to him, which they have uniformly refused to do.

Under these circumstances, Miller made application, on the 4th day of April, 1889, to Hon. Elmer S. Dundy, District Judge of the United States for the District of Nebraska, for a writ of *habeas corpus* to recover the care and custody of the child, reciting the circumstances hereinbefore stated, and also some other matters tending to show that the home of Burrus was not a fit place for the child to be brought up in. Upon this petition the writ was issued, and the defendant Burrus and his wife appeared before Judge Dundy at a regular term of the District Court. They stated the fact that they had had the

care and custody of the infant from a very short time after its birth and still had it; and that they had taken good care of it, were capable of taking good care of it, and were very much attached to it, and it was attached to them; and they claimed the right to continue in the custody and control of the child, who was then between eight and nine years old.

Afterwards, on the 25th day of June, 1889, Judge Dundy made an order that said Evelyn E. Miller, the child, was improperly detained and kept by Thomas Burrus and Catherine Burrus, and that she, the said Evelyn E. Miller, should be awarded to the care and custody of her father, Louis E. Miller, the petitioner, and that said Burrus and wife produce the child before the court within five days from the date of said order. From this order an appeal was taken to the Circuit Court for that District, before Judge Brewer, who decided that neither he nor the Circuit Court had any jurisdiction to hear the case on appeal, and remitted the case to the District Court. On the 16th of December, 1889, an order was made reciting that the court had heard the argument of counsel on a motion to stay proceedings and dismiss the cause for want of jurisdiction of the court, and the court being of opinion that the cause was properly before it, and that the judge had jurisdiction of the same, and ordering that the stay of proceedings theretofore granted be terminated, and that the judgment of the court made on the 25th day of June, 1889, be carried into effect. It appears that the order for the delivery of the child to the father was obeyed in the presence of the court, but that, Miller having started from Omaha for his home in Ohio with the child, the petitioner Burrus and his wife got into the same train, and crossed the Missouri River on that train, and that when they reached Council Bluffs, in the State of Iowa, on the opposite side of the river, they again made efforts to secure possession of the child. The result of these efforts was, that the father proceeded somewhat further into the State of Iowa, whilst the defendants, taking possession of the child with violence and against the will of the father, returned with it to the State of Nebraska. Thereupon Burrus and his wife were called before the District Court by a writ of attachment

for contempt in disobeying the orders of the court, and for this contempt Burrus was committed to imprisonment for three months in a county jail, in the custody of the marshal of Nebraska. It is from this imprisonment that he now seeks to be relieved by the present proceedings in this court; and the foundation of his claim of right to be so relieved is, that neither the District Court of Nebraska nor Judge Dundy, the judge of that court, had any jurisdiction whatever in the original case of *habeas corpus* before him. That is the only question in the present case, for we have no power under this writ to inquire into mere errors committed by the District Court in the progress of that case, and if we had, we are not satisfied that any such errors exist save as to the alleged error of the assumption of jurisdiction in the case. Whether such jurisdiction existed is, therefore, the sole question before us.

The question of the extent of the authority of the courts of the United States to use the writ of *habeas corpus* as a means of releasing persons held in unlawful custody has always been clouded with more or less doubt and uncertainty. The Constitution, by declaring that "the privilege of the writ of *habeas corpus* shall not be suspended unless when in cases of rebellion or invasion, the public safety may require it," added to the exalted estimate in which that writ has always been held in this country and in England. By the fourteenth section of the act establishing the judicial courts of the United States, it is declared "that all the before-mentioned courts of the United States shall have power to issue writs of *scire facias*, *habeas corpus*, and all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law; and that either of the Justices of the Supreme Court, as well as judges of the district courts, shall have power to grant writs of *habeas corpus* for the purpose of an inquiry into the cause of commitment: *Provided*, That writs of *habeas corpus* shall in no case extend to prisoners in jail unless where they are in custody under or by color of the authority of the United States, or are committed for trial before some court of the same, or are necessary to be brought into court to testify."

It will be seen in this section, that, while there may be many writs not specifically provided for in the statute which shall be within the powers of the courts of the United States, the framers of that statute were careful to mention specifically the writs of *scire facias* and of *habeas corpus*, and to make some special provisions in regard to the latter. As to the power of the courts to issue any of these writs it was said, that they must be necessary to the exercise of the jurisdiction of the respective courts and agreeable to the principles and usages of law. In reference to the writ of *habeas corpus*, it is expressly enacted that either of the Justices of the Supreme Court, as well as judges of the District Courts, shall have power to grant the writ for the purpose of an inquiry into the cause of commitment. This latter clause has been interpreted occasionally as authorizing the issuing of the writ in any case where a person is imprisoned or confined by an order of a court, for the purposes of an inquiry into the cause of commitment. But the proviso, proceeding upon the idea of the first clause, that in order to the issuing of this writ it must be necessary for the exercise of the jurisdiction of the court' which issues it, declares that the writ "shall in no case extend to prisoners in jail, unless where they are in custody under or by color of the authority of the United States, or are committed for trial before some court of the same, or are necessary to be brought into court to testify."

This statute, of course, left cases of prisoners in confinement by order of state authorities without the benefit of this writ from the courts or justices or judges of the United States, and the law remained in this condition until the events connected with the nullification proceedings in South Carolina, by which officers of the United States engaged in collecting the revenue and performing other duties in that State were for that reason subjected by the laws of South Carolina to imprisonment. In the recent case of *Cunningham* v. *Neagle*, 135 U. S. 1, we have had occasion to review the course of legislation by Congress on the subject of the writ of *habeas corpus*, which has mainly, as now found in the Revised Statutes of the United States, reference to provisions for protecting the individual

liberty of persons, citizens of the United States and subjects or citizens of foreign governments, from illegal imprisonment under state authority. It is not necessary to go over that field on this occasion. It is sufficient to say that the net result of the discussion is, that all the courts of the United States, and the justices and judges of all its courts, are authorized to issue the writ of *habeas corpus* in any case where a party is imprisoned or held in custody for an act done by or under the authority of the laws of the United States, or where his imprisonment is in violation of the Constitution of the United States, or where it is supposed to be in violation of the law of nations or of the United States, in all which cases the federal courts and judges have jurisdiction to make inquiry into the matter, and, in the language of the statute, when the prisoner is brought before them and the matter is inquired into, the court or justice or judge shall "dispose of the party as law and justice require." It is not now the law, therefore, and never was, that every person held in unlawful imprisonment has a right to invoke the aid of the courts of the United States for his release by the writ of *habeas corpus*. In order to obtain the benefit of this writ and to procure its being issued by the court or justice or judge who has a right to order its issue, it should be made to appear, upon the application for the writ, that it is founded upon some matter which justifies the exercise of federal authority, and which is necessary to the enforcement of rights under the Constitution, laws or treaties of the United States.

It is true that perhaps the court or judge who is asked to issue such a writ need not be very critical in looking into the petition or application for very clear grounds of the exercise of this jurisdiction, because, when the prisoner is brought before the court, or justice, or judge, his power to make full inquiry into the cause of commitment or detention will enable him to correct any errors or defects in the petition under which the writ issued ; and it is upon such hearing to be finally determined by the tribunal before whom the prisoner is brought whether his imprisonment or custody is in violation of the Constitution or laws or treaties of the United

States. The cases on this subject, as they have been decided in the courts of the country, are not altogether in accord, but we think this is a fair statement of the law as it stands at the present time, under the statutes of the United States and the decisions of this court.

This subject was considered with much ability in *Ex parte McCardle*, 6 Wall. 318. In that case, although the court was speaking mainly of the jurisdiction of this court by way of appeal, yet it made the following observation with reference to the act of February 5, 1867, 14 Stat. 385, then recently passed. The language of that statute was, that, in addition to the authority already conferred on the several courts of the United States and the justices and judges of said courts, they shall have power "to grant writs of *habeas corpus* in all cases where any person may be restrained of his or her liberty in violation of the Constitution, or of any treaty or law of the United States; and it shall be lawful for such person so restrained of his or her liberty to apply to either of said justices or judges for a writ of *habeas corpus*, which application shall be in writing and verified by affidavit, and shall set forth the facts concerning the detention of the party applying, in whose custody he or she is detained, and by virtue of what claim or authority, if known; and the said justice or judge to whom such application shall be made shall forthwith award a writ of *habeas corpus*, unless it shall appear from the petition itself that the party is not deprived of his or her liberty in contravention of the Constitution or laws of the United States." In reference to this statute, Chief Justice Chase, speaking for the court, in that case, said: "This legislation is of the most comprehensive character. It brings within the *habeas corpus* jurisdiction of every court and of every judge every possible case of privation of liberty contrary to the national Constitution, treaties or laws. It is impossible to widen this jurisdiction. It is to this jurisdiction that the system of appeals is applied." The provision of this statute is reproduced, with others on the same subject, in section 753 of the Revised Statutes.

In *Ex parte Dorr*, 3 How. 103, an application was made to

this court for a writ of *habeas corpus* to bring up the body of Thomas W. Dorr, of Rhode Island, on whose behalf it was alleged that he was held under sentence of death in violation of the Constitution and laws of the United States. The law then existing on the subject of the powers of the court in awarding writs of *habeas corpus* was the fourteenth section of the Judiciary Act of 1789, which we have already recited. This court, construing that section, said : " The power given to the courts, in this section, to issue writs of *scire facias*, *habeas corpus*, etc., as regards the writ of *habeas corpus*, is restricted by the proviso to cases where a prisoner is ' in custody under or by color of the authority of the United States, or has been committed for trial before some court of the same, or is necessary to be brought into court to testify.' This is so clear, from the language of the section, that any illustration of it would seem to be unnecessary. The words of the proviso are unambiguous. They admit of but one construction ; and that they qualify and restrict the preceding provisions of the section is indisputable. Neither this nor any other court of the United States, or judge thereof, can issue a *habeas corpus* to bring up a prisoner, who is in custody under a sentence or execution of a state court, for any other purpose than to be used as a witness ; and it is immaterial whether the imprisonment be under civil or criminal process." The motion for the *habeas corpus* was overruled. It was on account of this limited power of the federal courts to issue writs of *habeas corpus* that the various statutes referred to in *Ex parte Neagle* have since been passed ; among the rest, the one construed by this court in *Ex parte McCardle*, in which it is clear, from the language of Chief Justice Chase, that the original limitation upon the power remains, except as it is extended by the statute of 1867 and others on the same subject.

In the case before us there was no pretense that the child was restrained of its liberty, or that the grandfather withheld it from the possession and control of the father, under or by virtue of any authority of the United States, or that his possession of the child was in violation of the Constitution or any law or treaty of the United States. The whole subject of the

domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States. As to the right to the control and possession of this child, as it is contested by its father and its grandfather, it is one in regard to which neither the Congress of the United States nor any authority of the United States has any special jurisdiction. Whether the one or the other is entitled to the possession does not depend upon any act of Congress, or any treaty of the United States or its Constitution

The case of *Barry* v. *Mercein* is very instructive on this subject. Mr. Barry, who was a subject of the Queen of Great Britain, married an American lady, and after the birth of two children they separated, Mr. Barry residing in Nova Scotia and the wife in the State of New York. Mr. Barry made application first to the Court of Chancery of New York, by a writ of *habeas corpus*, to recover possession of his daughter. In the case of *The People.* v. *Mercein*, 8 Paige, 47, 55, Chancellor Walworth refused the relief he asked, saying that "a writ of *habeas corpus ad subjiciendum* is not, either by the common law or under the provisions of the Revised Statutes [of New York], the proper mode of instituting a proceeding to try the legal right of a party to the guardianship of an infant."

Mr. Barry then made application to the Circuit Court of the United States for the Southern District of New York, where his case was heard by Judge Betts, who delivered a very careful and a very able opinion, which has been furnished to us, in which he held that his court could not exercise the common law function of *parens patriæ*, and therefore had no jurisdiction over the matter, nor had it jurisdiction by virtue of any statute of the United States. The petitioner in that case alleged that he was a native born subject of the Queen of Great Britain, residing in Nova Scotia, and that his wife was a daughter of Mary Mercein, then a citizen of the State of New York, and that the mother and daughter held the custody of his child in violation of law. Judge Betts then, in a very able opinion, discusses the jurisdiction of the courts of the United States generally, and especially of the Circuit Court, in regard to a case like this, with the result which we have stated.

Prior to this the petitioner had made application to this court, in the exercise of its original jurisdiction, for the writ of *habeas corpus*, but the court declared that the case was not of that class of which it could assume original jurisdiction, and that no ground for the exercise of appellate jurisdiction was presented; and it therefore refused the application. *Ex parte Barry*, 2 How. 65. From the judgment of the Circuit Court by Judge Betts, Mr. Barry brought the case to this court by a writ of error, and a motion was made to dismiss the case for want of jurisdiction in this court. In this case, which was very elaborately argued, the opinion of the court was delivered by Chief Justice Taney, in which he said that " in the argument upon this motion, the power of the Circuit Court to award the writ of *habeas corpus*, in a case like this, has been very fully discussed at the bar. But this question is not before us, unless we have power by writ of error to reexamine the judgment given by the Circuit Court, and to affirm or reverse it, as we may find it to be correct or otherwise." He then proceeds to say that the appellate jurisdiction of the Supreme Court is governed by the amount or value in controversy, and adds: "In the case before us, the controversy is between the father and mother of an infant daughter. They are living separate from each other, and each claiming the right to the custody, care and society of their child. This is the matter in dispute; and it is evidently utterly incapable of being reduced to any standard of pecuniary value, as it rises superior to money considerations." *Barry* v. *Mercein*, 5 How. 103, 119, 120.

So far as the question whether the custody of a child can be brought into litigation in a Circuit Court of the United States, even where the citizenship of the opposing parties is such as ordinarily confers jurisdiction on that court, the matter was left undecided in the case of *Barry* v. *Mercein*. Obviously, although the statutes of the United States have since enlarged the jurisdiction of the Circuit Courts by declaring that they shall have original cognizance, concurrent with the courts of the several States, of all civil suits arising under the Constitution or laws of the United States, or treaties made. or

which shall be made, under their authority, the difficulty is not removed by this provision, for, as we have already said, the custody and guardianship by the parent of his child does not arise under the Constitution, laws or treaties of the United States and is not dependent on them.

But whether the diverse citizenship of parties contesting this right to the custody of the child, could, in the courts of the United States, give jurisdiction to those courts to determine that question, has never been decided by this court that we are aware of. Nor is it necessary to decide it in this case, for the order for a violation of which the petitioner is imprisoned for contempt is not a judgment of the Circuit Court of the United States, but a judgment of the District Court of the same District. There is apparently a studied effort in the record before us to treat the proceeding as one in the District Court of the United States for the District of Nebraska, and also as one before the judge of that court, but we apprehend that it must be considered for what it is worth, as the judgment of the District Court, both the order for the delivery of the child to its father and the order for the imprisonment of the present petitioner for contempt being made in that court. The jurisdiction of that court is not founded upon citizenship of the parties; and though the original petition of Miller, the father of the child, was amended after the judgment was rendered, so as to show that he was a citizen of the State of Ohio, and the defendants, Burrus and wife, were citizens of Nebraska, it is not perceived how that averment aids the parties in the present case, for the District Courts of the United States have not jurisdiction by reason of the citizenship of the parties. If, therefore, there was no other ground of jurisdiction of that court in the *habeas corpus* case, by which the child was delivered to its father, it was entirely without jurisdiction.

We have already said that the relations of the father and child are not matters governed by the laws of the United States, and that the writ of *habeas corpus* is not to be used by the judges or justices or courts of the United States except in cases where it is appropriate to their jurisdiction. Of course

this does not mean that they have jurisdiction in all cases to issue the writ of *habeas corpus*, but that they have such jurisdiction when, by reason of some other matter or thing in the case, the court has jurisdiction which it can enforce by means of this writ. Whatever, therefore, may be held to be the powers of the Circuit Courts in cases of this kind, where necessary citizenship exists between the contestants, which gives the court jurisdiction of all matters between such parties, both in law and equity, where the matter exceeds two thousand dollars in value, we know of no statute, no provision of law, no authority intended to be conferred upon the District Court of the United States to take cognizance of a case of this kind, either on the ground of citizenship, or on any other ground found in this case. According to this view of the subject, the whole proceeding before the District Judge in the District Court was *coram non judice* and void, and the attempt to enforce the judgment by attachment and imprisonment of Burrus for contempt of that order is equally void. *Ex parte Rowland*, 104 U. S. 604.

*The petitioner is, therefore, entitled to his discharge, and the rule against Slaughter, the marshal, is made absolute, and the writ of habeas corpus will issue, if that be necessary to his release.*

MR. JUSTICE BREWER dissented.

---

The opinion of Judge Betts in *In the matter of John A. Barry*, referred to by Mr. Justice Miller, *ante*, 594, was given in the Circuit Court of the United States for the Southern District of New York on the 25th of May, 1844. A very brief summary of it was printed in 7 Law Reporter, 374. At the request of members of this court it is here printed in full.

BETTS, J. On the first day of term the petitioner presented in open court, and filed, his petition praying that "the people's writ of *habeas corpus ad subjiciendum* may issue in his behalf directed to Mary Mercein, relict of the late Thomas R. Mercein, deceased, of the city of New York, and to Eliza Anna Barry, wife of the

petitioner, commanding them forthwith, immediately on the receipt of said writ, to have the body of Mary Mercein Barry, daughter of the petitioner, by them imprisoned or detained, with the time and cause of such imprisonment or detention, before this court, to do and receive what shall then and there be considered of the said Mary Mercein Barry."

The petitioner alleges that he is a native-born subject of the Queen of Great Britain, resident in Nova Scotia, and that he has never been naturalized or claimed naturalization under the laws of the United States.

That, in April, 1835, in the city of New York, he intermarried with Eliza Anna, daughter of the late Thomas R. Mercein, a citizen of said city.

That, in the month of May thereafter, he returned to Nova Scotia accompanied by his wife, and there resided about a year, when he removed his family to the city of New York, where he resided until April, 1838, when he returned to Nova Scotia with a portion of his family, and has continued to reside there from that time.

That a son and daughter were born of said marriage during his residence in the city of New York, and on his removal to Nova Scotia he left his wife and two children temporarily with her father in the city of New York.  That in the month of May thereafter he returned to New York, when difficulties arose between him and his wife respecting her removal to Nova Scotia, and she declared her determination to part with him rather than think of going to Nova Scotia.

That he remained in New York until the 28th of June, 1838, and with a view to arrange amicably the differences between himself and wife, he finally agreed to allow her to continue in New York at her father's house until the first day of May, 1839, and to retain in her care their said daughter, Mary Mercein, during that period, and also their son until such time as the petitioner might think proper to require him.

That in September following he returned to New York and made every possible effort to conciliate his wife and induce her to consent to go at some future time to her own proper home in Nova Scotia, but she utterly refusing and declaring that she had no expectation of so doing, the petitioner returned himself taking his son along with him.

That these attempts to conciliate her were frequently repeated

Note. In the Matter of Barry.

without avail, and the petitioner awaited the expiration of the time he had agreed she should remain with her father, and on the 2d day of May, 1839, formally demanded of the said Thomas R. Mercein the surrender of his said wife and child, which demand was not complied with.

That his wife, from that time to the present period, has refused to return to his home and has absented herself therefrom, contrary to his desires, and has detained and does still keep from him, unlawfully, his daughter, who is now in the seventh year of her age. That Thomas R. Mercein has lately deceased, and that thereby the wife of the petitioner is left without any present property, and little or no prospect of any in reversion, and that she has no property whatever of any kind in her own right, and has no means known to the petitioner for the present or future support of herself and their daughter, and that she resides with and is harbored in her present vicious and illegal condition by her mother, Mary, relict of the late Thomas R. Mercein.

The petitioner alleges his own ability to provide comfortably for the support and education of his daughter, and especially claims that she is a British subject, allegiant to the crown of Great Britain, at least during her minority.

The petitioner sets forth many other matters of aggravation in the separation from him, persisted in by his wife, and the countenance and support of her by her family in her conduct and refusal to return to her home.

These particulars it is unnecessary to rehearse, and the right to the remedy or relief claimed by the petitioner is not, in this stage of the case, to be determined by a consideration of the relative conduct of these parents toward each other or the child, or of the advantages to the infant, to be placed with the one rather than the other.

These matters would be most material if the case had proceeded so far as to require from the court a decision upon the question as to the fit or proper disposal of the infant.

The point now to be considered is, whether the petitioner has presented a case coming within the jurisdiction of this court; or, if this court has cognizance of the matter, whether the facts stated by the petitioner entitle him to the interference of the court in the manner prayed for.

The same petition in substance was presented to the Supreme

Court of the United States, at the last term, and was supported by an elaborate argument on the part of the petitioner.

The court observes, (*Ex parte Barry,*) 2 How. 65: "It is the case of a private individual, who is an alien, seeking redress for a supposed wrong done him by another private individual, who is a citizen of New York. It is plain, therefore, that this court has no original jurisdiction to entertain the present petition. . . . Without, therefore, entering into the merits of the present application, we are compelled, by our duty, to dismiss the petition, leaving the petitioner to seek redress in such other tribunal of the United States as may be entitled to grant it. If the petitioner has any title to redress in those tribunals, the vacancy in the office of judge of this court assigned to that circuit and district creates no legal obstruction to the pursuit thereof."

This instruction of the Supreme Court seems to be regarded by the petitioner as a declaration of that high tribunal that the United States Circuit Court for this district has the power to grant the relief demanded by the petition.

The expression of such opinion by that court, even in an incidental manner and not on a point under adjudication, would have the highest influence with this court, and would undoubtedly be adopted here as the rule of decision.

But the cautious and reserved phraseology employed by the Supreme Court in respect to the competency of any other United States tribunal to take cognizance of the subject, is, in my opinion, to be regarded rather as an admonition to the inferior courts, that grave difficulties rested over the matter, than an assurance to them that their original jurisdiction contained the authority to award the common law writ of *habeas corpus ad subjiciendum,* prayed for. That court says of itself: "We cannot issue any writ of *habeas corpus,* except when it is necessary for the exercise of the jurisdiction, original or appellate, given to it by the Constitution or laws of the United States," language plainly not employed to import that a Circuit Court has in this behalf a capacity transcending that of the Supreme Court, and can create a jurisdiction to itself by awarding writs of *habeas corpus.*

This opinion of the Supreme Court, I think, supplies no authority or suggestion in aid of the jurisdiction now invoked, and, taken most favorably, for the petitioner, merely leaves the question as to its power to award the writ to be settled by the

Circuit Court in consonance with the Constitution and laws of the United States.

The application to the Supreme Court was supported by an exposition of this case, intended to show that this petitioner's claim had been unjustly adjudged against in the courts of this State, and that the interposition of that tribunal was necessary to correct these erroneous judgments and secure the legal rights of the petitioner.

That argument with the decision of the Supreme Court on this motion, was also submitted to me with the petition, when filed.

On the perusal of these papers, I at first hesitated as to the course most proper to be pursued, preliminarily; whether to grant a rule against Mrs. Barry and Mrs. Mercein to show cause why the writ should not issue, or even to award the writ, with a view to have the entire case spread before the court, or such points presented as would lead to a definite decision of the case.

But as the adoption of either alternative must involve great delay and expense, both in the disposition of the case in the first instance, and in removing it by either party to the Supreme Court, for revision, and as the right of the petitioner to relief in this court, under any aspect of the case, was doubtful, I conceived it the least expensive and more convenient course to inquire and decide whether the petitioner presented a case of which this court should take cognizance.

When the cause of imprisonment or detention shown by the petition satisfies the court that the prisoner would be remanded, if brought up, the writ will not be awarded. *Watkins' Case,* 3 Pet. 193, 201, *per* Marshall, C. J.; *Milburn's Case,* 9 Pet. 704, 706; 2 Story Const. Law, 207, § 1341; *Ex parte Bollman,* 4 Cranch, 75.

The practice in the English courts is the same. Bac. Ab. Habeas Corpus B. No. 44, case cited; 4 Comyn Dig. (Day's ed.) 550 and note 3; Hallam's Const. Law, 20; *Penrice & Wynn's Case,* 2 Mod. 306; *Slater* v. *Slater,* 1 Levinz, 1; *The King* v. *Marsh,* 3 Bulst. 27; *Sir William Fish's Case,* cited in *White* v. *Wiltsheine,* 2 Rolle, 137, 138.

If upon the facts stated by the petitioner it shall be determined that the court cannot grant the relief prayed for, either for want of jurisdiction or because the law is against his demand, it would be inexpedient and oppressive to cause the parties implicated to be arraigned before this court and held under its control, pending

the discussion and consideration of the subject, and, accordingly, upon the doubts arising from a perusal of the papers, I deemed it proper to invite the petitioner in the first instance to support his petition by arguing these two points :

(1) Whether the United States Circuit Court has jurisdiction over the subject matter of his petition ;

(2) If such jurisdiction exists, do the facts stated upon the petition give the petitioner, under the law of the land, a title to the remedy prayed for ?

The petitioner has read an argument prepared with great research and ability in support of the affirmative of both inquiries, bringing into review numerous English and American decisions upon the same question, and has submitted the manuscript to the examination of the court. With the aid of this most ample discussion of this subject, I proceed to pronounce the result of my reflections upon this interesting and important case.

The incongruity of awarding proofs, at the instance of husband or wife, to take away an infant child from the parent having it in nurture and keeping, upon the allegation that such keeping is a wrongful imprisonment, is most palpable and striking. It is a bold figure of speech, or rather fiction, to which the law ought not to resort, unless indispensably necessary to be employed in preservation of parental rights, or the personal fondness of the child. The courts, however, assume such supposititious imprisonment to exist as the foundation for jurisdiction, to a limited extent, over the detention of infants, even by their parents, on the ground that the writ is rather to be considered a proceeding in the name and behalf of the sovereign than by one named person against the other. *Commonwealth* v. *Briggs*, 16 Pick. 203.

There is no reason to doubt that originally the common law writ was granted solely in cases of arrest and forcible imprisonment under color or claim of warrant of law.

As late as 2 James II, the court expressly denied its allowance in a case of detention or restraint by a private person, *Rex* v. *Drake*, Comberbach, 35 ; 16 Viner, 213 ; and the *habeas corpus* act of Charles II, which is claimed as the Magna Charta of British liberty, has relation only to imprisonment on criminal charges. 3 Bac. Ab. 438, note.

It is not important to inquire at what period the writ was first employed to place infant children under the disposal of courts of

law and equity. This was clearly so in England anterior to our Revolution, *Rex* v. *Smith*, 2 Strange, 982; *Rex* v. *Delaval*, 3 Burrow, 1434; *Blisset's Case*, Lofft, 748; and the practice has been fully confirmed in the continued assertion of the authority by those courts unto the present day. *King* v. *DeManneville*, 5 East, 221; *De Manneville* v. *DeManneville*, 10 Ves. 52; *Ball* v. *Ball*, 2 Sim. 35; *Ex parte Skinner*, 9 J. B. Moore, 278; *King* v. *Greenhill*, 4 Ad. & El. 624; and this indifferently, whether the interposition of the court is demanded by the father or mother. 4 Ad. & El. 624, *ubi sup.*; 9 Moore, 278, *ubi sup.*

The late act of 2 and 3 Vict. c. 54, (1839,) sanctions the principle, and would seem to reinstate the old dictum that the judgment and discretion of the court is not to be controlled by any supposed legal right of the father in exclusion of that of the mother, if the infant be within the age of seven years. An act of the State of New York, passed in 1830, had established the same doctrine within this State by positive law; and, independently of this statute, the course of the American courts in this respect had been substantially in consonance with the decisions in England, antecedent to the Revolution. *In re McDowle*, 8 Johns. 332; *In re Eliza Waldron*, 13 Johns. 418; *In re Wollstonecraft*, 4 Johns. Ch. 80; *People* v. *Mercein*, 8 Paige, 47; *Commonwealth* v. *Addicks*, 5 Binney, 520; *Commonwealth* v. *Briggs*, 16 Pick. 203; *State* v. *Smith*, 6 Greenl. 462.

The later cases in New York are founded upon a principle common to all the decisions cited; *People* v.——, 19 Wend. 16; *Mercein* v. *People*, 25 Wend. 63, 80; *People* v. *Mercein*, 3 Hill, 399; but in so far as they may seem to favor the latest adjudications in England, in respect to the fixed and controlling right of the father, as the true exposition of the common law rule, they are modified and overruled by the decisions of the Court of Errors. *Mercein* v. *People*, 25 Wend. 106; and Sittings 1844, MSS.

The petitioner in this case asks of the court the award of the common law writ of *habeas corpus ad subjiciendum*, with all of its common law attributes and efficacy.

That is a high mandate, by means of which courts or judges, in protection of the liberty of individuals, exercise functions appertaining to the sovereign power, and which in intendment of law rest only in the sovereign and are coëxtensive with his dominion. *Kendall* v. *United States*, 12 Pet. 524, 627, 629.

The writ is purely one of prerogative.   Whether emanating
from a King or a State, whether returnable before the King in
person, (as it undoubtedly was in its origin,) or awarded and acted
upon by magistrates as surrogates of the sovereign authority, it
has always been made to bring the party imprisoned directly before
the supreme power, that if there be not due cause of law for his de-
tention, the sovereign may set him free of his restraint.   3 Black.
Com. 131; Bac. Ab. Hab. Corp. 421; 3 Story Const. Law, 207;
*Ex parte Watkins*, 3 Pet. 193, 202; 2 Kent Com. 26, 29.

In respect to married women or other adults, held in detention
by private individuals, the sovereign, through this writ, acts as
*conservator pacis* and *custos morum*, and, in regard to infant chil-
dren, as *parens patriæ*, taking, in these high capacities, summary
order that the party be forthwith set at liberty, if improperly and
wrongfully detained.   Lofft, 748, and 13 Johns. 418, above cited;
*People* v. *Chegaray*, 18 Wend. 637; 8 Paige, 47, above cited;
*United States* v. *Green*, 3 Mason, 482.   The State, thus acting upon
the assumption that its *parentage* supersedes all authority conferred
by birth on the natural parents, takes upon itself the power and
right to dispose of the custody of children, as it shall judge best
for their welfare.   *People* v. *Chegaray*, 18 Wend. 642–3; *Blisset's
Case*, Lofft, 748.

The cases before cited show that the English and American
courts act in this behalf solely upon the assertion of the right of
the sovereign whose power they administer, to continue or change
the custody of the child at his discretion, as *parens patriæ*, allow-
ing the infant, if of competent age, to elect for himself; if not,
making the election for him.

Even in the extraordinary conclusions drawn from the facts
brought to light in *Commonwealth* v. *Addicks*, 5 Binney, 520, and
*The King* v. *Greenhill*, 4 Ad. & El. 624, both courts, in denying that
these facts called for any change of the custody of the children,
readjudged the principle, that it was their province, at common
law, authoritatively to decide that question according to their
legal discretion.

Does this common law prerogative, in relation to infants, rest in
the government of the United States, and has the Circuit Court
competent authority to exercise it?

The argument bearing upon the first branch of this inquiry
assumes two propositions as its basis: (1), that the government of

### Note. In the Matter of Barry.

the United States is supreme over all subjects within its cognizance; and (2), that the common law of England is embodied with, and has become a measure and source of authority to, the national government, and is to be enforced in the Circuit Court, whenever persons competent to sue in those courts prosecute their rights therein. It is believed that neither of these propositions can be maintained, and certainly not in respect to the subject matter of this proceeding.

Many of the powers of the general government are unquestionably supreme and exclusive, while others, especially those in relation to remedies afforded by its courts to private suitors, are only concurrent with similar powers possessed by the state governments. If the power in respect to parties competent to sue in the national federal courts could be supposed to exist in its absolute sense in the United States government, its exercise has been modified and restricted by Congress in the 11th section of the act of September 24, 1789, which gives the Circuit Courts no more than a concurrent jurisdiction with the state courts, of suits of a civil nature, at common law. 2 Stat. 60.

Nor again do all attributes of sovereignty devolve upon the national government. Whether considered as emanating directly from the people in their aggregate capacity, or as proceeding from the States, in their independent organization and character, the government of the Union is one of special powers, defined or necessarily implied in the terms of the grant. *McCulloch* v. *Maryland*, 4 Wheat. 407; 2 Story Const. § 1907; *Rhode Island* v. *Massachusetts*, 12 Pet. 657.

Though the point has been labored with ability by a late jurist of eminence in this department of legal learning, to deduce from the circumstances attendant upon the establishment of this government, that the common law became embodied in it, as an efficient principle of its authority and action, (Du Ponceau on Jurisd. 85–90,) yet the doctrine has never been declared or sanctioned by our courts.

So far as the decisions have gone, they tend to repudiate the principle *in toto*. *United States* v. *Hudson*, 7 Cranch, 32; *United States* v. *Coolidge*, 1 Wheat. 415.

There is, accordingly, no sure foundation for the assumption that the federal government possesses common law prerogatives inherent in the sovereign, which can be exercised without authority of positive law. *Martin* v. *Hunter*, 1 Wheat. 304, 329.

If any common law prerogative in relation to the administration of justice can be proved to exist in the sovereignty of the United States, it must, upon the same principle, be endowed with all such prerogatives, and can, on the like authority, unless inhibited by positive law, award writs of *mandamus; quo warranto, ne exeat, or mandates* to citizens abroad to return home on pain of confiscation of their estates, (Comyn's Dig. Prerogatives, D. 34, 35,) or this writ of *habeas corpus;* they being all common law writs *ejusdem generis.*

That such attributes or functions of sovereignty cannot be inherent in the United States government necessarily results from the character of the government and the objects of its constitution.

It is not designed, in its organization or aim, to regulate the individual or municipal relations of the citizen. These are left under the dominion of the state government; and there accordingly exists no relation between the nation and individuals, which affords foundation for these prerogatives.

The social or personal duties or liabilities of the citizens come within the control of the general government only when remitted to its charge by a special cession of authority, and then solely to the end that such regulations as are of a federal character may be enforced, — as in relation to land and naval forces, and persons in the employ of the United States, the punishment of offences, etc., etc., — but in other respects the national government does not supply the law governing the citizen in his domestic or individual capacity. These particulars appertain to the institutions and policy of the respective States.

This reasoning, however, may not be supposed to meet fully the case presented by the petitioner; for although, in the abstract, there may be no prerogative authority in the head of the United States government, yet the argument would maintain that its courts of justice, as organized, may possess all the powers exercised by superior courts at common law, and the issuing and acting upon writs of *habeas corpus ad subjiciendum* become thereby a branch of jurisdiction necessarily incident to the constitution of such courts.

This hypothesis overlooks the peculiar foundation of the United States judiciary, and the allotment of its functions in respect to the powers of the States.

Note. In the Matter of Barry.

The federal government came into force coördinately with, or as the concomitant of, state governments at the time existing, and in the full exercise of legislative, executive and judicial sovereignty.

These sovereignties are left entire under the action of the general government, except in so far only as the powers are transferred to the federal head, by the constitution, or are by that prohibited to the States, or, in some few instances, are allotted to be exercised concurrently by the two governments.

The United States judiciary is constituted and put in action in the several States, in subordination to this fundamental principle of the Union, and empowered to exercise only such peculiar and special supremacy, and not one in its absolute sense.

To render this connection of the United States judiciary with that of the States more intimate and entire, and to take away all implication that it was a paramount power acting irrespective of state laws, or that it possessed or could exercise any inherent jurisdiction countervailing those laws, the act of Congress organizing the courts establishes it as an element in their procedure, that the laws of the State where the court sits shall be its rule of decision in common law cases.

It necessarily results, as a consequence of this special character of the United States judiciary, that it can possess no powers other than those specifically conferred by the Constitution or laws of the Union, and such incidents thereto as are necessary to the proper execution of its jurisdiction. All other judicial powers necessary to the complement of supreme authority remain with and are exercised by the States.

This doctrine is sufficiently indicated in the decision of the Supreme Court made in this case at the last term, and it has been invariably recognized from the earliest adjudications of the court. *Chisholm* v. *Georgia*, 2 Dall. 419, 432, 435; *Ex parte Bollman*, 4 Cranch, 75; *Ex parte Watkins*, 3 Pet. at page 201; *Kendall* v. *United States*, 12 Pet. 524.

The jurisdiction of the United States courts depends exclusively on the Constitution and laws of the United States, and they can, neither in criminal nor civil cases, resort to the common law as a source of jurisdiction. *United States* v. *Hudson*, 7 Cranch, 32; *United States* v. *Coolidge*, 1 Wheat. 415; *Chisholm* v. *Georgia*, 2 Dall. 432; *Ex parte Bollman*, 4 Cranch, 75; *Pawlet* v. *Clark*, 9.

Cranch, 333; *Ex parte Randolph,* 2 Brock. 477; *Wheaton* v. *Peters,* 8 Pet. 590, 658; *The Steamboat Orleans,* 11 Pet. 175; *Kendall* v. *United States,* 12 Pet. 524.

It is now argued that this principle is limited to the Supreme Court; but that in respect to the Circuit Courts, they have a common law jurisdiction incident to their constitution, inasmuch as judicial sovereignty resides in them, rendering the range of their original jurisdiction coëxtensive with the subjects of litigation arising under the Constitution and laws of the United States, and because all remedies not otherwise provided are, in the exercise of that judicial sovereignty, to be in conformity to the common law.

Although the speculations of our most eminent jurists may countenance this argument, (Du Ponceau, 85; 1 Kent Com. 341,) yet it has not received the sanction of the United States courts. *Chisholm* v. *Georgia,* 2 Dall. 435; *Kendall* v. *United States,* 12 Pet. pp. 616, *per cur.*, and 626, Taney, C. J.; *Ex parte Bollman,* 4 Cranch, 87; *Ex parte Randolph,* 2 Brock. 477, Marshall, C. J.; *Lorman* v. *Clarke,* 2 McLean, 568.

The distinction established by the cases is clear and practical, and embraces all United States courts alike, and is, in effect, that those courts derive no jurisdiction from the common law, but that in those cases in which jurisdiction is appointed by statute, and attaches, the remedies in these courts are to be according to the principles of the common law. *Baines* v. *Schooner James,* 1 Baldw. 544, 558; *Robinson* v. *Campbell,* 3 Wheat. 212, 223; *United States* v. *Hudson,* 7 Cranch, 32; *Ex parte Kearney,* 7 Wheat. 38; *Anderson* v. *Dunn,* 6 Wheat. 204; *Ex parte Randolph,* 2 Brock. 477.

It is not, accordingly, conclusive of their right to take cognizance of the subject matter, to show that the parties connected therewith are competent to sue or be sued in the United States courts, and that there is a perfect right of action or defence thereupon supplied such parties at common law. The evidence must go further, and prove that the particular subject matter is one over which the courts are by act of Congress appointed to act, or that the question has relation to the remedy alone, and not to the jurisdiction of the court. *United States* v. *Bevans,* 3 Wheat. 336, 389; *McCulloch* v. *Maryland, ubi sup.* at p. 407; *Rhode Island* v. *Massachusetts, ubi sup.* at p. 721.

The authority to take cognizance of the detention of infants by private persons, not held under claim, or color, or warrant of law,

rests solely in England on the common law. It is one of the eminent prerogatives of the crown, which implies in the monarch the guardianship of infants paramount to that of their natural parents. The royal prerogative, at first exercised personally *ad libitum* by the King, 12 Pet. 630, and afterwards, for his relief, by special officers, as the Lord High Constable, the Lord High Admiral and the Lord Chancellor, in process of time devolved upon the high courts of equity and law, and in them this exalted one, of allowing and enforcing the writ of *habeas corpus ad subjiciendum*, became vested as an elementary branch of their jurisdiction. In the performance, however, of this high function in respect to the detention of infants by parents, etc., the court or judge still acts with submission to the original principle, out of which it sprang, that infants ought to be left where found, or to be taken from that custody and transferred to some other, at the discretion of the prerogative guardian, and according to its opinion of their best interest and safety.

The reference already made to the origin and object of our federal Union demonstrates that no prerogative of this character could be exercised as an incident to its qualified and peculiar sovereignty; and I think it equally clear, that the inherent authority of no branch of the judiciary can transcend that of the government in this behalf, and that it has no capacity to issue this writ, or act upon it, except under appointment by positive law. *Ex parte Bollman*, 4 Cranch, 75, 93.

It remains then only to consider whether such jurisdiction is conferred upon the Circuit Courts by statute; for, even if the language of the Constitution might import such authority to be within the competency of the judiciary, it is authoritatively established that the Circuit Courts, at least, cannot exercise jurisdiction as to individual rights, because authorized by the Constitution, unless Congress has specifically assigned it to them. They possess no jurisdiction other than that which both the Constitution and acts of Congress concur in conferring upon them. *Turner v. Bank of North America*, 4 Dall. 8, 10; *United States Bank v. Devaux*, 5 Cranch, 61; *Livingston v. Van Ingen*, 1 Paine, 45; *Hodgson v. Bowerbank*, 5 Cranch, 303; *Kendall v. United States, ubi sup.; Ex parte Bollman, ubi sup.* at p. 93; *McClung v. Silliman*, 6 Wheat., 598.

The 9th section of the first article of the Constitution, para-

graph 2, declaring that "the privilege of the writ of *habeas corpus* shall not be suspended, unless when in cases of rebellion or invasion the public safety may require it," does not purport to convey power or jurisdiction to the judiciary. It is in restraint of executive and legislative powers, and no further affects the judiciary than to impose on them the necessity, if the privilege of *habeas corpus* is suspended by any authority, to decide whether the exigency demanded by the Constitution exists to sanction the act.

So, although the 2d section of the 3d article gives the United States judiciary jurisdiction over *all cases* in law and equity between our own citizens and the citizens or subjects of foreign states, yet, as already shown, the Circuit Court cannot, under that provision, act on one of the subjects without an express authorization by statute. *McClung* v. *Silliman, ubi sup.*

In our government the judiciary power acts only to give effect to the voice of the legislature. *Osborn* v. *United States Bank,* 9 Wheat. 738, 866.

The material question in the case must, accordingly, be, whether Congress has given to the Circuit Courts the special jurisdiction appealed to by the petitioner.

Judge Story holds that the courts of the United States are vested with full authority to issue the great writ of *habeas corpus* in cases properly within the jurisdiction of the national government. 2 Story Const. § 1341.

The general doctrine the commentator is discussing, and the authorities supporting it, have relation to the law as it exists in England and in the respective States of the Union. The only case referred to as giving application of the general doctrine to the United States courts is that of *Ex parte Bollman, and Ex parte Swartwout,* 4 Cranch, 75.

That was a case of imprisonment on a criminal charge, under and by color of the authority of the United States, the prisoners having been committed by the Circuit Court of the District of Columbia, on a charge of treason against the United States; and the Supreme Court held, that though it could not take cognizance of the matter under any common law jurisdiction, yet the act of Congress of September 24, 1789, had conferred the jurisdiction, and they proceeded, by virtue of the statute, to exercise it in the case.

The court nowhere advert to an implied power in the Circuit Courts broader than that vested in the Supreme Court, which

· would empower a Circuit Court to grant the writ upon the footing of a general jurisdiction in respect to the parties to be affected by it.

The positions adopted as the basis of the decision would seem to look to an entirely opposite conclusion. Chief Justice Marshall says : " Courts which originate in the common law possess a jurisdiction which must be regulated by the common law, until some statute shall change their established principles; but courts which are created by written law, and whose jurisdiction is defined by written law, cannot transcend that jurisdiction. . . . It extends," in the case of United States courts, " only to the power of taking cognizance of any question between individuals, or between the government and individuals. To enable the court to decide on such question, the power to determine it must be given by written law."

This language of the Chief Justice is explicit against the theory that the United States courts have necessarily cognizance of all subjects of litigation arising between parties over whom they have jurisdiction.

So in respect to another prerogative writ, that of mandamus, the Supreme Court, in disavowing in itself the power to issue it in the common law sense, holds, in terms not less definite and decisive, that the Circuit Courts cannot award it but by virtue of express authority from statute, *Kendall* v. *United States*, 12 Pet. 524; and this conclusion has no exclusive connection with the particular writ of mandamus, but flows from the doctrine definitely announced by the court, that the United States judiciary has no authority to award prerogative writs of any character further than the power is specifically given by statute.

The relator refers to the argument of counsel, in the case of *Bollman and Swartwout*, as demonstrating that the 14th section of the act of Congress of September 24, 1789, imparts to the United · States courts authority as ample as exists in the Supreme Courts of judicature at common law, in the application and enforcement of the writ of *habeas corpus*.

No judicial decision (unless it be that of *United States* v. *Green*, 3 Mason, 482) is found· which sanctions that exposition of the statute; and it accordingly· becomes necessary to examine with attention the foundation of the construction contended for.

The terms of the statute are " that all the before-mentioned

courts of the United States shall have power to issue writs of *scire facias, habeas corpus,* and all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law. And that either of the justices of the Supreme Court, as well as judges of the District Courts, shall have power to grant writs of *habeas corpus* for the purpose of an inquiry into the cause of commitment : *Provided,* That writs of *habeas corpus* shall in no case extend to prisoners in gaol, unless when they are in custody, under or by color of the authority of the United States, or are committed for trial before some court of the same, or are necessary to be brought into court to testify."

The scope· and purport of this enactment were very carefully considered by the Supreme Court. *Ex parte Bollman*, 4 Cranch, 75 ; *Ex parte Watkins,* 3 Pet. 201. The courts being authorized to issue the writ "for the purpose of an inquiry into the cause· of commitment," the Supreme Court regarded the provisions of the act as incorporating in a considerable degree the English law on' the subject, and that the statute of 31 Charles II had defined the cases in England in which relief could be had, under the writ, by persons detained in custody, and was an enforcement of the com-, mon law in that respect.

The argument of the court tends clearly to the conclusion that our act was 'to be construed as applicable to the cases embraced within the English *habeas corpus* act, and as framed in reference to the law established by that statute.

If the term " commitment " in our act is used in its common acceptation, it would have reference to the forcible confinement of a person under color of legal protest or authority. In its common law sense, it imports an imprisonment under a warrant or order on a criminal charge and no other, 4 Bl. Com. 296; 2 Hawk. c. 16, §§ 1, 2, 3, 13, 14, 15, and under the statute, all the judges of England decided that the act of Charles did not extend to any cases of imprisonment, detainer, or restraint whatsoever, except cases of commitment 'for criminal or supposed criminal matters. 3 Bac. Ab. 438, 'note.

As our statute uses the term *commitment,* and drops the limitation of it in the English act " for any criminal or supposed criminal matter," it may be reasonable, in favor of liberty, to understand it in its broadest signification. A court of deservedly high

character decided that, under our statute, a writ of *habeas corpus* lies to inquire into the cause of *commitment*, though made on civil process. *Ex parte Randolph*, 2 Brock. 447, 476; see, also, *Bank of the United States* v. *Jenkins*, 18 Johns. 303, 309. But it is to be borne in mind that the Supreme Court hesitated as to the soundness of this interpretation of the statute; for, in *Ex parte Wilson*, Chief Justice Marshall, after consultation with the judges, on a motion for a *habeas corpus*, stated that the court was not satisfied that a *habeas corpus* is the proper remedy in a case of arrest under civil process, 6 Cranch, 52, and the writ was denied; and to the same effect was the decision of the Supreme Court of New York. *Cable* v. *Cooper*, 15 Johns. 152.

If the more extended interpretation of the term be adopted, and cases of commitment for civil or criminal matters may be brought under review by *habeas corpus*, yet in view of the qualified character of the federal government, and the special jurisdiction of its judiciary, the more reasonable inference would be that Congress intended the protection of this writ should be interposed by its courts only in cases of imprisonment under color or claim of the authority of the United States.

Rawle, an eminent commentator on the Constitution, says that the writ of *habeas corpus* is restrained to imprisonments under the authority of the United States. Rawle on Const. 115, 2d ed. 117.

Every adjudicated case in the United States courts, with one exception, has been under writs sued out for relief against an actual arrest of a party under process, or his confinement by claim of authority of the United States. *United States* v. *Hamilton*, 3 Dall. 17; *United States* v. *Johns*, 4 Dall. 412; *Ex parte Burford*, 3 Cranch, 448; *Ex parte Bollman*, 4 Cranch, 75; *Ex parte Kearney*, 7 Wheat. 38; *Ex parte Watkins*, 3 Pet. 193, 201; *Ex parte Milburn*, 9 Pet. 704; *United States* v. *Bainbridge*, 1 Mason, 71; *Ex parte Cabrera*, 1 Wash. C. C. 232; *Ex parte Randolph*, 2 Brock. 471, in which a doubt is made whether the writ may not apply in case of imprisonment on civil process.

Judge Washington, on *habeas corpus*, adjudged the matter not within the cognizance of the Circuit Court, because the prisoner was not in custody by authority of the United States, and was not committed for trial before any of its courts. *Ex parte Cabrera*, 1 Wash. C. C. 237.

The *proviso* to the 14th section, above recited, looks to such limitations of the writ. It is palpable that Congress did not intend that an inquiry into the cause of *commitment* of a person detained should authorize the United States courts to interfere with his custody, unless the subject matter upon which he was confined was to be acted on and decided by the United States tribunals.

This policy of the statute is emphatically indicated by the act of March 2, 1833, c. 57, § 7, in which special powers are conferred on the United States courts to liberate by *habeas corpus* even persons confined under authority of state law, for any act done or omitted to be done, in pursuance of a law of the United States, or in pursuance of any order, process, or decree of any judge or court thereof. Both clauses denote that it was the violation of a law of the United States or its just authority, in the imprisonment of the citizen, that was intended by Congress to be inquired into and remedied by *habeas corpus* before the courts of the United States.

My opinion upon this review of this subject is, that there is no foundation for the claim that there is vested in the United States government a common law prerogative, or that the Circuit Court can, upon the footing of common law prerogative, by writ of *habeas corpus*, assume and exercise this function of *parens patriœ* in relation to infant children held in detention by private individuals, not acting under color of authority from the laws of the United States.

And it also seems equally clear to me that the authority given by the 14th section of the Judiciary Act, to issue writs of *habeas corpus* " for the purpose of an inquiry into the cause of commitment," necessarily restricts the jurisdiction of the courts to commitments under process or authority of the United States.

I should, upon the conclusions against the competency of the court to take cognizance of the matter, feel constrained to deny the petition, but for the decision of the Circuit Court in the First Circuit, in an analogous case, where the relief now prayed for was granted. *United States* v. *Green*, 3 Mason, 482.

The jurisdiction of the court was not brought in question, and was undoubtedly conceded by the parties, but the acquiescence in a legal proposition so important, by a judge of the exact and varied learning of Judge Story, and one whose judicial habit is so cautious and investigating, is an imposing authority in its support.

Note. In the Matter of Barry.

A citizen of New York sued out a *habeas corpus* against a citizen of Rhode Island, the grandfather of his infant child, to recover possession of the child, which was retained and defended against the demand of the father. The court took cognizance of the subject matter, and, after full hearing, decided the question of rightful custody upon its merits in favor of the father. It was supposed that the Circuit Court possessed such authority under the provisions of the 11th and 14th sections of the Judiciary Act.

The 11th section gives Circuit Courts original cognizance, concurrent with the courts of the several States, of all suits of a civil nature, at common law or in equity, etc., etc., when one party is a citizen of the State where the suit is brought and the other an alien, etc., etc. 2 Bioren's Laws U. S. 60, 61; 1 Stat. 78.

It is well settled that Congress has not, in this section, exhausted the powers vested in them by the 2d section of the 3d article of the Constitution, and imparted to the Circuit Courts cognizance of *all cases* at common law which might be within the control of the legislative power. *Turner* v. *Bank of North America*, 4 Dall. 11; *Bank of the United States* v. *Devaux*, 5 Cranch, 61.

The Supreme Court say there is manifestly some limitation to the authority of the Circuit Courts in respect to the cases therein brought within the purview of their jurisdiction, and that those courts have not jurisdiction, under the 11th section, of all suits or cases of a civil nature at common law. *Kendall* v. *United States*, 12 Pet. at p. 616.

Two particulars must concur as the foundation of a suit in a Circuit Court — that the litigant parties be competent to sue and be sued, and that the subject matter be one over which the court has cognizance. *Voorhees* v. *United States Bank*, 10 Pet. 449, 474.

A procedure by *habeas corpus* can in no legal sense be regarded as a suit or controversy between private parties. It is an inquisition by the government, at the suggestion and instance of an individual, most probably, but still in the name and capacity of the sovereign, to ascertain whether the infant in this case is wrongfully detained, and in a way conducive to its prejudice.

Neither in England or the States in this country does the court regard this as *a suit* in which the right of guardianship is to be discussed or decided. *Rex* v. *Smith*, 2 Strange, 982; *People* v. *Mercein*, 8 Paige, 47; *In re Wollstonecraft*, 4 Johns. Ch. 80; *In re McDowle*, 8 Johns. 328, 332.

Judge Story, in the case cited, manifestly took the same view of the subject. 3 Mason, 482, *ubi sup.*

There would, moreover, be a technical objection to this proceeding, if a suit, which the court might not be permitted to overlook.

Neither in this country nor in England can an action be prosecuted by an individual in the name of the government, without express authority of the court, or the officer appointed by law to represent the public. And no distinction is made between actions popular in their nature and those in which the private suitor is solely the party in interest.

The authority of the Circuit Court to take cognizance of the case must, probably, then, be deduced from the provisions of the 14th section, in conjunction with those of the 11th; and the first clause or branch of the 14th section must be accepted as giving the courts of the United States power to issue the writ of *habeas corpus*, without the restriction of the subsequent clause, to "the purpose of an inquiry into the cause of commitment." And the 11th section must be regarded as supplying the parties in whose behalf such general power may be exercised.

The argument was pressed with great earnestness before the Supreme Court in *Bollman and Swartwout's Case*, that the first clause of this section was to be interpreted as a positive and absolute grant of power, 4 Cranch, 82; but the court does not seem to have yielded to that construction, for, in reference to that point they say that "the true sense of the words is to be determined by the nature of the provision and by the context." 4 Cranch, 94. And they evidently regard the whole section as having relation to one and the same matter.

The principles established by the Supreme Court and brought in review in that case, would seem to militate so strongly against the doctrine involved in the case of *United States* v. *Green*, as to prevent this court adopting the latter as its guide in determining this point; but without asserting that such diversity exists in the judgments of the Supreme and Circuit Courts, and admitting that the decision in 3 Mason stands unimpaired as an authority, I proceed to consider the remaining general inquiry, whether by the law of the land the petitioner is entitled to the relief asked for.

What, then, is the law which this court administers? For that will be the law of the land in respect to these parties and the subject matter of this petition.

Note. In the Matter of Barry.

The argument assumes it to be the common law of England as declared and enforced by her courts, and that the most recent adjudications in those tribunals is the highest and most important evidence of what the law is, and must supply the rule of decision to the United States courts. This view of the subject disregards the special organization of the United States Circuit Courts and the limited purposes they were designed to subserve.

They are distributed amongst the States to exercise that special jurisdiction bestowed upon the federal government, or shared with it by the state sovereignties, and not to carry with them an inherent power to resort to or employ any other law than that given them by express and written grant. *Chisholm v. Green,* 2 Dall. 432, 435; *Ex parte Barry,* 2 How. 65. Although the people brought with them, on their emigration to this country, the essential principles of the common law, and embodied them in their institutions, yet this was not done by them in a national capacity, (at the time no such character or capacity was contemplated,) but as distinct communities independent of each other. *Chisholm* v. *Georgia,* 2 Dall. 419, 435; *Bains* v. *Schooner James,* 2 Bald. 544, 557.

Nor has the common law been adopted by the United States as a system applicable to the States generally and to be administered as such in the national courts. *Kendall* v. *United States,* 12 Pet. 621.

This has been done specifically by act of Congress in relation to the District of Columbia, *Kendall* v. *United States,* 12 Pet. 621; but in respect to the States the common law is regarded in force only as adopted or modified by the Constitution, statutes, or usages of the States respectively. It came to them and was appropriated by them, and became an integral portion of the laws of the particular States, before the United States government had existence. 1 Story Com. Const. c. 16, 17; 1 Kent, 471, and notes; *Pawlet* v. *Clark,* 9 Cranch, 292, 333; *Southwick* v. *Postmaster General,* 2 Pet. 446.

In bringing this new government into action amidst sovereignties already organized and established, it would be a cardinal object to have the limited share of judicial authority possessed by the national judiciary administered, as far as practicable, in consonance with the laws and usages of the State where the court was placed.

Political considerations of the highest moment would exact this. The disquietude and jealousy in relation to this new power would

be aggravated tenfold if, in addition to its authority under appointment of positive law, it could, by its inherent jurisdiction, supplant local customs and usages, and substitute in their place the common law of England in its primitive plentitude and vigor.

There was a deep-rooted attachment in the States to their own laws and ·customs, whilst every influence acting on the public mind at that day would tend to induce alarm and distrust of English law, ·except only in so far as it had already been modified and adopted by express authority of the States.

All the early legislation of Congress manifests the purpose to affiliate the new system with that of the State, and especially, in the jurisprudence as between individuals, to have the writs of the one government or the other organs of the same law, and con-trolled by a common rule of decision.

This principle was varied only when the Constitution of the United States, treaties, or acts of Congress provided a specific law for the case.

Accordingly, when Congress assigned to the Circuit Courts sitting within the States "original cognizance, concurrent with the courts of the several States, of all suits of a civil nature, at common law," it was careful to direct "that the laws of the several States, except where the Constitution, treaties or statutes of the United States shall otherwise require or provide, shall be regarded as rules of decision in trials at common law in the courts of the United States in cases where they apply." Act September 24, 1789, §§ 11 and 34, 1 Stat. 78, 92.

The Supreme Court has recently decided that the decisions of the state courts are not laws of the State, within the purview of this section of the act of Congress, in questions of a commercial character, and that such questions are to be determined according to general principles of mercantile law, recognized by American and English authorities. *Swift* v. *Tyson*, 16 Pet. 1. The argument upon which the decision is founded insists that only the statutes of the State, or long established local customs having the force of laws, are embraced within the language of the clause, and that the court has always understood the section to apply solely to state laws, strictly local — positive statutes — and their construction by the state tribunals, and to rights and titles to things having a permanent locality, immovable and intraterritorial in their nature or character.

Note.  In the Matter of Barry.

· This exposition by the Supreme Court, so far as it covers this·
question, is the law of the land, to the same extent and with·
equal force with the statute itself; and although a state statute,
which should declare the laws of the United States a rule of
decision in commercial questions, would scarcely be understood to
exclude this decision as appertaining to that character, yet, under
the authority of that adjudication, this court is bound to regard
only certain classes of decisions made by the state tribunals as
laws of the State within contemplation of the Judiciary Act, what-
ever may be their authority within the State itself.

But it would seem, from the opinion of the Supreme Court that
long-established local customs, having the form of laws, come
within the terms of the section and must be followed by the
United States courts as rules of decision, and that the decisions of ·
the state courts are evidence of what the laws of the State are.

The court in the same opinion declares that the decisions of the
state courts upon even commercial questions are entitled to and
will receive the most deliberate attention and respect of. the
Supreme Court, though they do not supply positive rules or con-
clusive authority.  *Swift* v. *Tyson*, 16 Pet. at p. 19.

This decision confirms the general doctrine, before stated, that
the Circuit Court is bound to administer the laws of the State.
It perhaps renders indefinite and ambiguous to some degree the
methods by which the United States court is to ascertain and
determine what that law is; whether if it is not found on the
statute book, it is to be authenticated by the dicta and decisions
of English jurists, or by the adjudications of the local judica-
tories.

The proposition on which the petition rests is, that a subject of
the Queen of Great Britain, resident in Nova Scotia, is entitled, as
father of a female child under the age of seven years, born within
this State, to have that child taken, by writ of *habeas corpus*, from
the keeping of its mother, and transferred by the judgment of this
court to his custody, the mother being a native and resident of this
State, but residing in the family of her parents, separate from her
husband, and without his consent, and refusing to cohabit with
him.

Do the laws of the State of New York give him that right, and,
if they do, can they be enforced in this court?

The United States courts cannot take cognizance of matters of

right created or conferred by local statutes. It is to be presupposed that a case at common law exists, of which the United States court acquires jurisdiction under an act of Congress, and the determination of that right is then to be made in conformity with the State law.

It is accordingly unnecessary to consider the question which has been raised in the state courts, whether, under the Revised Statutes, 2 Rev. Stats. N. Y. 477, § 88, (1st ed.,) there exists in this State any common law right or remedy by *habeas corpus*, because, if the 11th and 14th sections of the Judiciary Act bring the case within the jurisdiction of this court, it must proceed to adjudicate on it conformably to the general principles of the common law of England, *Ex parte Watkins*, 3 Pet. 201, unless that rule is varied by the local laws.

Nor need the point be discussed, whether, if an infant is brought before this court on *habeas corpus*, on the application of its father or guardian, the court can act on the matter as if the writ were presented at the instance of the mother, and accordingly regard the provisions in the Revised Statutes as the rule of decision for governing the case. 2 Rev. Stats. N. Y. (1st ed.) 82, §§ 1, 2.

The question now is, whether the petitioner can demand as his legal right the writ prayed for, on the facts stated in his petition?

The present posture of the case does not raise the point whether the individual cause of action has been adjudicated and settled by the state courts, so as to bar the party from again prosecuting it; but the proposition to be determined is one general in its nature whether the facts stated in this petition entitle any party, as matter of right, to relief by a *habeas corpus*.

This subject has undergone a most searching discussion before various tribunals of the State. Two of the local judges and the chancellor, on these facts, allowed a writ, but refused to award the custody of the child to the father. *People* v. *Mercein*, 8 Paige, 47.

The Supreme Court, on full discussion, adopted a different conclusion, and, by two solemn decisions, adjudged that the father, under such a state of facts, was by law entitled to the custody of the infant child. 25 Wend. 82, *ubi sup.*; 3 Hill, 405, *ubi sup.* These judgments of the Supreme Court were reviewed on error in the Court of Errors, and both reversed by that tribunal. *Mercein* v. *People*, 25 Wend. 106; MSS. Ops. Session 1844, *ubi sup.*

Note. In the Matter of Barry.

The Supreme Court based their decisions upon the doctrines of the common law, and not upon the terms of the Revised Statutes, 2 Rev. Stats. N. Y. 466, § 23, the language of which certainly comprehends the broadest range ever given the writ by the English courts, and might very plausibly be urged as extending it to matters not before embraced within that remedy. Revisers' notes, 3 Rev. Stats. N. Y. 784.

The substance of the enactment is, that a *habeas corpus* shall issue on the application of any person (by petition signed by himself, or another in his behalf) "committed, *detained*, confined, or *restrained* of his liberty, for any criminal or supposed criminal matter, or *under any pretence whatsoever*," 2 Rev. Stats. N. Y. 466, (1st ed.) §§ 23, 25, with some exceptions that need not now be noticed.

It must, therefore, be regarded as the settled law of this State, so far forth as the decision of the Court of Errors, twice rendered on this point, can furnish the law, that the keeping of an infant female child under seven years of age, from its father, by the mother, living separate from him, and who has it in her nurture, is not, in judgment of law, a detention or restraint of the liberty of the child; and that the father is not entitled by writ of *habeas corpus* to have such possession of the mother adjudged illegal, nor to have the custody of the child awarded him.

These decisions have been stigmatized on the argument as outrages upon the common law doctrine on this subject, and as devoid of all claims to professional consideration and respect.

Most earnest efforts were made to place them in disparaging contrast with the opinions of the individual judges of the Supreme Court, whose judgments upon the point are overruled by the Court of Errors; and this, not by weighing the arguments of one tribunal against those of the other on the subject, but by sharp invectives against the constitution of that high court, and the competency of its individual members.

This court was solicitous to allow the petitioner the opportunity to discuss his case in all its bearings, and, as his language was decorous in terms, did not feel called upon to check the course of remarks conducing and palpably intended to impute ignorance or disregard of the law, in this respect, to that high tribunal; but I should do injustice to my own convictions if I omitted to observe that, on a careful perusal of the opinions leading to the decisions

of the respective courts on this subject, I discover nothing in the ultimate judgments of the Court of Errors which places that judicatory in disadvantageous contrast with the one whose opinion it reviews and reverses.

Every lawyer, however, is well aware that a decision is not to be estimated merely by the ability or learning displayed in its composition, but essentially by the sanction it obtains.

Of what value toward establishing a principle or fixing a rule of law is the most erudite opinion of a high judge, when the full bench to whom it is submitted adopts a different conclusion, although *sub silentio?*

What court or lawyer, in searching for and applying a rule of law, rests upon the dissenting arguments of judges, in the courts of this country or England, whatever be their grade or reputation?

The judgment sanctioned by the court can alone answer the exigencies and meet the inquiry.

The more elevated the rank of the court may be, the higher becomes the sanction of its judgments.

Every system of jurisprudence imports in its organization that, upon questions mooted from tribunal to tribunal, the judgment of the one of last resort is conclusive proof of what the law is upon the points in dispute; and this entirely irrespective of the qualifications of the members of such *dernier* court.

A barrister would not be permitted to argue in Westminster Hall that a decision of the House of Lords, on a writ of error, weighed nothing in settling the law of the case, in comparison with the reasonings of the individual judges on the case, in the courts below.

A decision by the House of Lords ends all question before every tribunal of the kingdom as to the point adjudicated, and this is certainly not founded upon the fact that any extraordinary judicial learning or experience exists in that body, or is brought to act on the subject matter.

That court is lauded by Sir William Blackstone and English writers generally as one of the eminently excellent features of the British Constitution, and as the most august tribunal in the world.

Its judgments of reversal annihilate the decisions of the courts of Ireland and Scotland, rendered unanimously by all the judges, and also of the Lord Chancellor and all the judges, barons and lords of English courts of law and equity, and no party, subject

or foreigner, can be permitted to gainsay the efficiency and wisdom of such final determination.

And yet, in that court, on the decision of appeals from Ireland and Scotland, in admiralty and in equity, the Lord Chancellor almost invariably sits and acts as sole judge.

Lord Brougham asserts that he rarely or ever, when Lord Chancellor, could obtain the assistance of any other member of the court to sit with him on review of his own decisions, and that he, solely, had to decide questions brought from the Irish and Scotch courts where all the members of those tribunals had concurred in judgment upon points resting on local and peculiar laws.

When the House of Lords sits on writs of error only three lords need be in attendance. No more in fact do attend, and these three may change daily; and it results in practice that the three noble lords who ultimately decide that the twelve judges of England have erred in their opinion of the law were neither of them present at the argument on the writ of error. These facts are asserted by Lord Brougham, in the face of the House of Lords, and stand uncontradicted. 2 Chitty's Practice, 587, note 4.

Whatever obloquy may be aimed at the construction of the Court of Errors in this State, there are features in its constitution which elevate it most honorably in comparison with that of the House of Lords.

At least twenty-one members must be present at the hearing and decision of every case in the Court of Errors, and those members alone who hear the argument take part in the decision; and it is doubted whether any period can be referred to in the history of these two exalted tribunals, since they have had coëxistence, in which the professional learning and experience in the New York Court of Errors was not at least equal in amount to that contained in the English House of Lords.

The decisions of the Court of Errors are, within the State of New York, obligatory to the same extent as enactments by positive law. It no more diminishes their efficiency that the judgment of one court may be modified or varied by that of its successor, than the vitality of a statute is impaired, because it is liable to repeal at the will of the legislature. Such judgments are absolute rules of decision in all cases to which they apply in the state tribunals; *Hanford* v. *Artcher*, 4 Hill, 271; *Butler* v. *Van Wyck*, 1 Hill, 438, and although, within the doctrines declared by the Supreme Court

in *Swift* v. *Tyson*, 16 Pet. 19, they are not laws in a technical sense, and as such obligatory upon this court, still, on the inquiry as to what the law of the State is, such decisions must supply evidence of great weight and cogency.

Indeed, what particulars can be regarded as in principle more local or intraterritorial than those which pertain to the domestic institutions of a State — the social and domestic relations of its citizens; or what could probably be less within the meaning of Congress, than that in regard to these interesting matters, the courts of the United States should be empowered to introduce rules and principles because found in the ancient common law, which should extinguish or supersede the policy and cherished usages of a State, authenticated and sanctified as part of her laws by the judgments of her highest tribunals?

In my opinion, the rule indicated by the Supreme Court in *Swift* v. *Tyson*, if not limited strictly to questions of commercial law, does not embrace the present case, and that the adjudications of the Court of Errors, prescribing the laws of its citizens in respect to the custody of infant children resident in the State, and the relative rights of parents in respect to such children, are rules of decision in this court in all common law cases touching these questions.

But if not so, and the United States court is to act independently of all control by the decisions of the local courts, and is to determine for itself what the common law rule is in relation to such matters, the judgment of the local tribunal cannot but be of most imposing weight and significancy as a matter of evidence.

I do not discover that that judgment stands opposed to any authentic evidence of the common law rule as it existed in England anterior to our Revolution, or which has ever existed in this State; and if even a doubt might be raised on that point, the inclination of this court most assuredly must be to yield to the domestic and not to the foreign interpretation of the rule.

If it be conceded that the more recent decisions in England establish the law of that country now to be as claimed by the petitioner, they supply no authority here, further than they correspond with the law as clearly existing antecedent to 1775. I am not aware the doctrine has ever been countenanced in the Supreme Court of the United States that modern decisions in the English courts, unsanctioned by ancient tradition, are entitled to outweigh those of state courts in fixing the final laws of the State.

Note. In the Matter of Barry.

The value of the latest decision, the most relied on, that of *King v. Greenhill*, 4 Ad. & El. 624, when brought in competition with those of the American courts, upon an inquiry into the *reason* of the law, is essentially impaired by the declaration of Lord Denman in the House of Lords, (the judge who pronounced the decision below,) that he was ashamed of the necessity which exacted a decision of that character from a British court; and of a late Lord Chancellor, on the same occasion, that the rule of law announced by that decision was a disgrace to the English character.

But I do not feel that it is imposed on this court to revise the subject at large, and determine what is the true rule of the common law in this respect.

The United States court in no way acts in supervision of the state courts. The decisions of these tribunals are independent of the United States judiciary, and absolute in themselves, in all cases not subject to review in the method pointed out by the Judiciary acts. 4 Cranch 96, 97. This case is not in that predicament. The extent of the authority of this court, on the principle of its organization, is no more than to act concurrently with the state court upon the subject matter of this petition.

If that concurrence does not import and exact an entire coincidence, if each tribunal acting within its sphere may examine and declare for itself, independently of the other, what rule of law shall govern the decisions, that comity at least due between coördinate courts, if not that intimate and special relation of both to a common source and standard of law, would demand that neither should rigorously insist upon a principle which would bring it in collision with the other; the more especially that the United States courts should avoid, upon a balanced question, adopting conclusions which, carried into execution, must violate the domestic policy of the State, settled by the most solemn adjudications of its own judiciary.

The alienage of the petitioner would not vary this principle, even if it be conceded that by the laws of his domicil he is entitled as absolutely to the custody of his infant children as to that of his estate.

No interest, not even one resting in contract, is enforced by a court when it is repugnant to the laws or policy of the place where the action is prosecuted. *Pearsall v. Wright*, 2 Mass. 84, 89; *Vermont Bank v. Porter*, 5 Day, 316, 320; *Bank of Augusta v. Earle*, 13 Pet. 519, 589.

It by no means is an indisputable doctrine of public law, or of the law of this country, that the father of this infant can have here the same legal rights and dominion over it as if born within the country of his allegiance, for, if so, it might impart to him a power abhorrent to the civilization and Christianity of our age, giving him a dominion no less absolute than one over his chattels, animate or inanimate.

I do not, however, go into this topic, nor regard it as having any important bearing upon the decision now made. I apprehend it has been sufficiently shown that neither in England, before our Revolution, nor in this State since, has judgment been rendered under a *habeas corpus* in regard to infants, on the acceptation that the right of the father to their custody was anything in the nature of property, or so fixed in law as to afford a controlling rule of decision to the court. In the use of the remedy afforded by means of this writ, the courts have regarded the father as that guardian first to be looked to, in case a change of custody should be deemed proper, and the infant was not of competent age to make its own choice of guardian; but it has been purely in the application of the remedy and for the protection and interest of the infant, and not in subordination to the legal right of the father, that such award is ever made.

Nothing is clearer in international law than that a party prosecuting upon the clearest right under the laws of his country must still take his remedy in accordance with the law of the court he invokes, without regard to the law of his allegiance, and that his demand of this particular relief is no way aided by the consideration that it would be awarded him in England or Nova Scotia.

I close this protracted discussion by saying that I deny the writ of *habeas corpus* prayed for, because,

(1) If granted, and a return was made admitting the facts stated in the petition, I should discharge the infant, on the ground that this court cannot exercise the common law function of *parens patriæ;* and has no common law jurisdiction over the matter;

(2) Because the court has not judicial cognizance in the matter by virtue of any statute of the United States; or,

(3) If such jurisdiction is to be implied, that then the decision of the Court of Errors of New York supplies the rule of law, or furnishes the highest evidence of the common law rule, which is to be the rule of decision in the case; and,

Note. In the Matter of Barry.

(4) Because, by that rule, the father is not entitled, on the case made by this petitioner, to take this child out of the custody of its mother.

*Petition denied.*